STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK DE STASIO, DEFENDANT-APPELLANT.

Argued January 24, 1967—Reargued April 27, 1967— Decided May 1, 1967.

*Mr. Michael A. Querques* and *Mr. Harvey Weissbard* argued the cause for appellant (*Mr. Harvey Weissbard*, of counsel; *Messrs. Querques and Isles*, attorneys).

*Mr. Brendan T. Byrne*, Essex County Prosecutor, argued the cause for respondent (*Mr. Barry H. Evenchick*, Assistant County Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. A jury convicted defendant of bookmaking in violation of *N. J. S.* 2A:112–3. He was sentenced to a term of one to two years and fined $1,000. We certified his appeal to the Appellate Division before it was argued there.

I

The first question is whether defendant's privilege of silence under the Fifth Amendment was violated by the prosecutor's opening statement to the jury.

██ In the *voir dire* examination of the jurors, counsel for defendant inquired as to whether greater credit would be given a policeman's testimony "as opposed to an ordinary man who would get up there and who would not be a policeman," and when a juror, upon further inquiry of him, said he would not, counsel for defendant echoed the juror by saying "you would tend to weigh their testimony the same way in your own mind." Obviously responding to this line of inquiry, the prosecutor, in his opening to the jury, said:

"* * * As counsel [for the defendant] pointed out, these are police officers and you are not to give any more weight to what they say than to what anybody else who comes in and testifies to, but, I ask you, what motive do they have not to tell the truth today? I ask you to consider that just as you would consider any testimony that the defendant might give."

Counsel for defendant moved at side bar for a mistrial on the ground that the quoted statement harbored the potential of an adverse comment if defendant should later decide not to testify. In fact defendant did not testify. Nor did he produce any witnesses.

It is evident that the prosecutor had no thought of anticipating defendant's decision not to testify. The prosecutor simply reacted to the defense inquiry of the jurors. The trial court denied the motion for a mistrial and instructed the jury at once, quoting the prosecutor's statement without embellishment and saying in part:

"Now, this statement by the prosecutor in his opening to you is not a proper statement. It is not proper comment and I am striking it from the record and I direct you to completely disregard this statement and not to take it into consideration at all. Treat it as a statement not having been made in this case. Dismiss it entirely from this case."

We gather that defense counsel withdrew the motion for mistrial after it was denied, explaining that "I was not really sure that the jury may have heard it or it sank in,"

and adding, although not by way of an objection, that he thought it would have been better if the trial court had said nothing to the jury.

We see no substance to the complaint. We think the defense was unduly sensitive to what the prosecutor said. In any event, if the jury understood the prosecutor's statement in that vein, the court's instruction was tantamount to a charge that no inference could be drawn from a defendant's failure to testify.

█ Lawyers seem unable to agree upon whether a trial court should say something with respect to a defendant's failure to testify. Some trial judges ask the defendant to state his wish. We have rejected a claim that it was "plain error" not to instruct a jury, on the court's own motion, that no inference may be drawn. *State v. Aviles*, 49 *N. J.* 192 (1967). In the present case, counsel for defendant seemingly holds another view of jury psychology, although he does not urge it was error for the trial court to speak on the topic. We see no error in either course, at least in the absence of a request by a defendant. Surely the Constitution does not stoop to choose between those competing views of jury behavior. In any event, we see no possible harm. *Chapman v. State of California*, 386 *U. S.* 18, 87 *S. Ct.* 824, 17 *L. Ed. 2d* 705 (Feb. 20, 1967).

## II

Defendant says there should have been a directed verdict of acquittal because, in his words, "There was absolutely no proof in this case that the appellant recorded or registered any bets given to him by the bettors. At best it could only be said that the bettors gave him bets previously written down by them."

█ Defendant contends *State v. Morano*, 134 *N. J. L.* 295, 299 (*E. & A.* 1946), supports his position. This is too literal a reading of that opinion. The statute, *N. J. S.* 2A:112–3, speaks of a person who "makes or takes what is

commonly known as a book." The offense resides in the gambling aspect of the bookmaker's operation, rather than in the method whereby he keeps track of the wagers. It makes no difference whether the bets are committed to paper or to memory, and hence it is not necessary to prove a tangible record was made.

## III

The minimum jail sentence imposed upon defendant is the statutory minimum for the crime, *N. J. S.* 2A:112–3, but defendant nonetheless contends the sentencing procedure was illegal.

First he complains that he was sentenced by a judge other than the one before whom he was tried. This was done pursuant to an administrative directive issued by our Court under its plenary responsibility for the administration of all courts in the State, *N. J. Const., Art.* VI, § II, ¶ 3. The directive is stated in a memorandum from the Administrative Director to the Assignment Judges which reads:

"The Supreme Court is of the view that it is essential for the fair and effective administration of criminal justice that judges in imposing sentences adhere to the same general policy in cases which may involve syndicated crime. Unfortunately, in gambling cases efforts to achieve such uniformity, even within the same county, have not been successful when sentences have been imposed by whatever judge happens to be sitting at the time. Accordingly, the Supreme Court considers it necessary to require that the Assignment Judge in each county either personally handle all sentencing in gambling cases or designate a particular judge to impose sentence in all such cases, even though the case may have been tried or the plea taken before another judge.

The Supreme Court will appreciate your advising the judges and the prosecutors in your county or counties of this policy and requests that you keep me advised as to who will handle sentences in gambling cases in each of your counties."

As the directive itself suggests, we adopted this approach to the problem of syndicated gambling because years of experience convinced us that the public interest required it.

█ Uniformity of treatment is an ideal of law enforcement. "That different judges sentence differently is, and always has been, a major and justified complaint against the courts." *Report by the President's Commission on Law Enforcement and Administration of Justice,* "The Challenge of Crime in a Free Society" (Feb. 1967), *p.* 145. We have held judicial seminars in the hope that an exchange of views might lead to more uniformity in sentencing. Discussions between the sentencing judge and the probation department tend to assist in this direction. No doubt trial judges consult with one another in difficult cases to benefit from the experiences of each other, and this too can serve to reduce disparity in treatment. See Levin, "Towards a More Enlightened Sentencing Procedure," 45 *Neb. L. Rev.* 499 (1966). To the same end a dozen States have provided for appellate review of sentences, *Report by the President's Commission, supra, p.* 145, and we have considered such a program. Advocates of the indeterminate sentence find in such sentences a promise of uniformity of treatment.

Syndicated gambling is an area within which uniformity can be approached. Unlike most crimes, the factual picture is itself quite uniform. A bookmaker is a bookmaker and a runner is a runner. The details of the criminal event are pretty much the same. The demeanor of the defendant on the stand, if he takes it, ordinarily is not critical. The feel of one case is pretty much the feel of most others. The presentence report sums up the crime and the offender.

Even the circumstances of the individual offenders are more constant than in the case of most other crimes. By and large the defendants who are caught are not vicious and do not menace society in other respects, but they are the hired help of the syndicate without which it could not operate. The difficulty has been that some judges cannot see beyond the individual they are sentencing. If such a judge imposes nothing more painful than a fine, his view is almost certain to become the rule of the county in which he sits. This is so because defendants will wait for that judge, if

they can, and plead guilty before him. Moreover, a soft judge can make a sensible one seem harsh and severe, and hence, unhappily, judges tend to abide by the performance of the most unrealistic among them. In other words, the very uniformity of both the offense and the situation of the offenders tends to make disparate treatment unmistakable and thereby to label judges with respect to their attitude toward these offenses.

For these reasons, we decided as a matter of administrative policy to have all sentencing in these matters handled by a single judge in each county.

██ Defendant says this procedure violates *R. R.* 3:7–4(c) which provides for sentencing by another judge if the trial judge is unable to conclude the cause by reason of termination of office, absence, death, sickness, or other disability. This rule was adopted to deal with the contingencies just stated. *Cf.* Annotation, 83 *A. L. R.* 2d 1032, 1041 (1962); 24 *C. J. S. Criminal Law* § 1561, *pp.* 393–394; *Moore, Federal Practice* (2d ed, Cipes), § 25.03. It does not bear upon the exercise of the Court's administrative power, and of course we may in any event relax or change our rules of practice and procedure.

Defendant urges a number of constitutional challenges, all based upon a hypothesis the directive does not contain, *i. e.,* that the sentencing judge is required to send to State prison everyone convicted of a gambling crime unless the defendant cooperates with the State by giving evidence against his superior in the criminal hierarchy. There is no such order to the sentencing judge, and in fact the record of sentencing in Essex County shows that each sentencing judge has differentiated among offenders or classes of offenders. In the present case the sentencing judge made it plain that he understood the directive and was exercising his own discretion.[1]

---

[1] He said:
"* * * As I have stated, I will be guided by my own conclusions after what I consider is a proper evaluation of the case. In guiding

We have not dictated a course for the sentencing judge, and we could not in the absence of a right in the State to appellate review of sentences. Nonetheless we had occasion to express our views on this subject in *State v. Ivan,* 33 *N. J.* 197 (1960), and, as in other areas of judicial discretion, we would hope the sentencing judge would see the judiciary's responsibility as we see it. Presumably because we stated our views in *Ivan,* counsel assumed our administrative directive contained an order compelling adherence to them. There being no such order, and the sentencing judge being under no misapprehension, we need say no more to decide this case. But since it is charged in substance that our expressions in *Ivan* offend the Federal Constitution, we will consider that criticism.

In *State v. Ivan* defendant pleaded *non vult* to an indictment for bookmaking. He was sentenced to a term of one to two years and fined $5,000. Defendant appealed, charging "the trial judge had a preconceived policy that offenses of that kind merit the sentence imposed without regard to the circumstances of the individual offender," and stressing "that he had no prior conviction, is a good family man, and has a record of regular employment in industry" (33 *N. J.,* at *p.* 199).
We said (at *p.* 199):

---

myself by my own conscience, I shall also be guided by the prescription set forth by the law. I have not asked this man to unburden himself. I have not asked him to engage in a confession. I have not asked him to do anything.

MR. ISLES: I know you haven't.

THE COURT: He stands before me convicted of the crime of bookmaking after a judgment has been rendered by a jury of his peers. All I have before me, and all I will consider, is the presentence investigation and the remarks of counsel and the remarks of the defendant.

Now, it is true that I am sentencing under a directive of the Supreme Court, but I find nothing that anyone can do so far as a Judge is concerned, and so far as I am concerned, that will influence my decision. Nothing has been directed toward my discretion other than the exercise of fairness under the circumstances represented by the evaluation that I have discussed."

"The transcript does not support a claim that the mentioned circumstances were ignored. The trial judge had before him the presentence report required by *R. R.* 3 :7–10(*b*). As we read the record, the trial judge expressed the view that the challenge of organized gambling cannot be met without effective deterrence; that a sentence such as the one imposed is necessary to protect the public interest; that none of the facts in the presentence report or presented by counsel were sufficient to justify a different course; that, on the contrary, the report showed that defendant would not reveal the identity of his superior in the gambling operation, giving the stock explanation that he knows only the first name of that individual, an answer the trial court understandably declined to credit. Upon these total circumstances the trial judge sentenced as he did. He made it plain that he would take another course if the defendant, instead of protecting others and thus assisting them to continue their illegal venture, had evidenced a willingness to side with law and order."

After discussing the sundry values involved in sentencing in criminal matters, we said (at *p.* 202) :

"Here we are dealing with organized crime. The offense is in no sense an isolated excursion beyond the pale of the law induced by engulfing circumstances. It may be such as to the particular individual at the bar, and if he alone were implicated in the criminal operation, a judge might well deal with him as he would with other first offenders. But when the offense serves the interests of a widespread conspiracy, it would be a mistake to think of the defendant as an isolated figure. He is part and parcel of an enterprise. The gambling racket is an ancient foe of society. It bilks the weak. It wrecks homes and destroys men. It spawns embezzlement, larceny and crimes of violence. It corrupts officialdom. It is reputed to be allied with other illicit traffic. The 'easy' money it yields doubtless finds its way under cover into legitimate fields, there to continue its polluting course.

Such is the scene a judge should see in dealing with an offense of this kind. He would be myopic if he saw no more than the defendant before him. As the trial court aptly observed, a fine would be a license fee for the operators—a minor experience in a lucrative venture. A racket cannot be curtailed if fronts and tools are easily available, and they will be unless the price is too high."

These views find support in the recent report, cited above, by the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society" (Feb. 1967). With respect to organized crime, the report reads (at *p.* 188) :

"Law enforcement officials agree almost unanimously that gambling is the greatest source of revenue for organized crime. It ranges from lotteries, such as 'numbers' or 'bolita,' to off-track horse betting, bets on sporting events, large dice games and illegal casinos. In large cities where organized criminal groups exist, very few of the gambling operators are independent of a large organization. Anyone whose independent operation becomes successful is likely to receive a visit from an organization representative who convinces the independent, through fear or promise of greater profit, to share his revenue with the organization."

It adds (at *p*. 199) :

"Gambling is the largest source of revenue for the criminal cartels, but the members of organized crime know they can operate free of significant punishment. Street workers have little reason to be deterred from joining the ranks of criminal organizations by fear of long jail sentences or large fines. Judges are reluctant to jail bookmakers and lottery operators. Even when offenders are convicted, the sentences are often very light. Fines are paid by the organization and considered a business expense."

In *State v. Ivan,* we not only held that the trial judge's policy was free of error but we added our agreement with his exercise of discretion, saying (at *p*. 203) :

"We find no illegality in the position of the trial court. More than that, we affirmatively agree with his exercise of his discretion. *N. J. S.* 2A:112–3 provides for a *minimum* fine of $1,000 or a *minimum* jail sentence of one year or both. In requiring minimum punishment, the Legislature expressed a stern view of the criminal act itself. It wisely allowed some room for appraisal of individual cases. If the sentencing judge believes the gambling offense is isolated and involves but the defendant himself, he may deal with the offender at the lower end of the scale of punishment. But if the statutory prescription means anything, it must mean that if the crime is part of a larger operation, it merits stern treatment. The trial judge wisely coordinated that policy with the social gain in the redemption of the individual. He offered defendant a chance to make a clean breast of his associations. The offer had a dual purpose. It tested the capacity of defendant for rehabilitation by lesser punishment. It also sought to obtain for law enforcement officials the aid they need if they are to succeed in their exhausting efforts to stamp out syndicated crime or at least to hedge it in."

Defendant claims *Thomas v. United States,* 368 *F.* 2d 941 (5 *Cir.* 1966), goes against our view. There defendant was

convicted of bank robbery by a jury's verdict after a trial in which defendant swore he had nothing to do with the crime. Before imposing sentence the trial judge told defendant he had no doubt of his guilt and that if he confessed, the court would take the confession into account in the length of the sentence. Defendant maintained his innocence and the maximum sentence of 25 years was imposed. The Court of Appeals properly said that a sentence may not be increased because a defendant defended against the charge or insisted upon his right of appeal. But the Court of Appeals distinguished such obvious oppression from the very different proposition that the sentencing judge may reduce a sentence because of repentance, saying (at *p.* 945):

"\* \* \* True, he received the maximum sentence, but perhaps the district court already had that in mind, and was simply giving Thomas a last minute chance to repent and thereby to secure a reduction of that sentence."

Being unsure of the sentencing judge's thinking, the Court of Appeals remanded the matter for reconsideration, adding that "we should not go so far as to direct the District Court to impose no more severe sentence than it had intended in the event of a confession of guilt by Thomas" (at *p.* 947).

The views expressed in *Thomas* are elementary and *Ivan* does not clash with them. Indeed in *Ivan* the defendant had pleaded *non vult* and hence no price was placed upon the assertion of the right to defend or to appeal. Rather the trial court imposed the sentence the offense demanded in the public interest upon the premise that defendant's confession of guilt was not enough to warrant a lesser sentence and that nothing less than cooperation would merit a reduction. Far from penalizing the act of defending, such an approach to sentencing, if it has any tendency, tends to encourage defendants to insist upon trial even though there is no semblance of a defense. The real complaint of the gambling interests can only be that their employee is unable to escape a jail term by a plea of guilty.

 We see no trace of a constitutional question. The Federal Constitution does not prohibit the Supreme Court of a State from expressing its views upon the proper exercise of discretion by trial judges. Government being formed to protect the citizen from attack from within as well as from without, it behooves the three branches to cooperate to that end.[2] The powers of government are distributed to avoid a tyranny of power within a single head, and not so that one branch shall frustrate another or be indifferent to its burden. The judiciary would fail in its allotted responsibility if it pursued policies which render futile the best efforts of the other branches to protect the citizen from criminal hurt.

 Nor is there substance to the claim that the individual is denied equality when the court deals specially with the special evils of syndicated crime, or that due process is denied because some hypothetical defendant may not be a part of a syndicated gambling operation and thus be unable to receive consideration for aiding the State or may omit to aid the State for fear of some other involvement. If a defendant receives the punishment his offense warrants, he has received his due. It would be grossly unfair to the many if all had to be sentenced without regard to their acknowledgment of guilt or their aid to the State in coping with crime, merely because a prospect of favorable treatment could induce someone to abandon his defense or his appeal.

 Others may take a different view of what is just, and of course we would not deny them their right to do so. The question is whether the Constitution of the United States dictates a single answer. It seems evident to us that

---

[2] The judiciary shares in the responsibility for law enforcement. The court convenes and instructs the grand jury. *R. R.* 3:3–1. The court controls the trial calendar. Indictments may not be dismissed except with the approval of the court. *R. R.* 3:11–3(a). The court may request the Attorney General to supersede the county prosecutor. *N. J. S. A.* 52:17A–5. The court may compel the county to provide additional sums for the county prosecutor. See, *State v. Rush*, 46 *N. J.* 399, 414 (1966). The county prosecutor, as an attorney, is like all other attorneys an officer of the court in his relations with it.

it leaves judges free to disagree. This is as it should be. The Constitution must not be busied with issues that are *minutiae* in a grand scheme of things; it serves best as a majestic presence, unperturbed by claims of absolute verity in matters economic, social, moral, spiritual, medical or penological. It is very human, and very wrong, to see one's image in every nook of the Constitution. There must be tolerance of disagreement, for without it there can be no experimentation or ready accommodation to a changing scene. Of greater importance, the judiciary must not lose popular acceptance as the final arbiter of the Constitution in historic disputes. This unique mystic value could be lost if the Constitution, construed to be weighted down with matters of legislative calibre, could command no higher regard.

The judgment is affirmed.

JACOBS, J. (concurring in result):

I find neither prejudicial trial error nor constitutional infirmity in the sentencing procedure and therefore join my colleagues in affirming. But I do not share their belief that the administrative directive represents a wise exercise of policy and is compatible with modern views of penology and sound judicial administration. As applied here, it withdraws the sentencing power from the judge who tried the case and transfers it, not to a specialist "sentencing tribunal" (45 *Neb. L. Rev.*, at 498), but to another judge who had nothing at all to do with the trial and who had no specialized training or skill in sentencing. It suggests general distrust which may breed general incompetence (Holmes, J., in *Graham v. United States,* 231 *U. S.* 474, 480, 34 *S. Ct.* 148, 58 *L. Ed.* 319, 324 (1913)), and may sap much needed strength and vitality in our trial bench as a whole. And it unfortunately shackles the power of the conscientious trial judge to do full and complete justice as he finds it in the light of all of the trial testimony before him, the vital needs for the public welfare and the protection of society,

and the individual considerations applicable to the particular defendant.

In the law review article cited in the Court's opinion, Judge Levin discussed steps which have been taken elsewhere and might well be taken here towards eliminating unwarranted disparities in sentencing. None of those steps involved any abandonment of individualization of sentence or any disregard of individual justice. In Judge Levin's own language, the just sentence "will reflect the divergent backgrounds and present circumstances of each individual offender, his present attitudes, and the nature of the offending act itself." 45 *Neb. L. Rev.*, at *p.* 499. No defendant, even in gambling cases, is just the same as every other defendant. He is an individual human being with his own background and future and is entitled to be dealt with as such. His sentence, though it may appropriately be severe, should nonetheless be a just one imposed by the trial judge, as in all other cases under the prevailing system, after he has carefully considered and duly weighed all of the circumstances and all of the societal and individual interests involved. See Goodman, "In Defense of Federal Judicial Sentencing," 46 *Calif. L. Rev.* 497 (1958); *Papers Delivered at the Institute on Sentencing for United States District Judges,* 35 *F. R. D.* 381 (1964); *First Philadelphia Judicial Sentencing Institute,* 40 *F. R. D.* 399 (1965); *cf.* Hart, "The Aims of the Criminal Law," 23 *Law & Contemp. Prob.* 401 (1958); Tappan, "Sentencing Under The Model Penal Code," 23 *Law & Contemp. Prob.* 528 (1958); see also *Model Penal Code Art.* 7 (Proposed Official Draft, 1962); *National Council on Crime and Delinquency, Model Sentencing Act Arts.* I–III and Comments (1963).

Justices SCHETTINO and HANEMAN agree with the views expressed in this concurrence.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.