# FRED SILBERT ET AL. *v.* STATE OF MARYLAND

[Nos. 217, 297, 298, 299, 300 and 301, September Term, 1970.]

*Decided August 3, 1971.*

518

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH and POWERS, JJ.

*E. Thomas Maxwell, Jr.,* for appellants in No. 217. *E. Thomas Maxwell, Jr.,* and *Lawrence F. O'Donnell* for appellant in No. 297. *E. Thomas Maxwell, Jr., Lawrence F. O'Donnell* and *Joseph S. Kaufman* for appellants in No. 298. Submitted on brief by *Harold I. Glaser* for Maurice Silbert in No. 299. *Robert F. Freeze* for appellant in No. 300. *E. Thomas Maxwell, Jr.,* and *Lawrence F. O'Donnell* for appellant in No. 301.

*Francis X. Pugh, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert C. Ozer, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Between the months of May and October of 1967, a team of agents of the Internal Revenue Service, operating in an undercover capacity, conducted an investigation in Baltimore City into suspected violations of the Federal Wagering Tax laws. Five of the federal agents subsequently testified before the Grand Jury of Baltimore City. As a result, a number of indictments were returned on May 9, 1968, charging the appellants, either individually or jointly, with various substantive violations of the State's gambling and lottery laws, conspiracy to violate the lottery laws, and with maintaining a disorderly house. The cases were tried in the Criminal Court of Baltimore almost continuously from January 13, 1969 to April 1, 1969 with these results:

520

I. *Indictment 2893* (Appeal No. 217)

Appellants Fred Silbert, Arnold Silbert, Michael Silbert, and Delores Wilt were found guilty by a jury of both counts of the Indictment, *viz.*, (1) continuously from May 10, 1967 to November 15, 1967, at the Florida Bar, maintaining a disorderly house for gambling purposes, and (2) during the same period of time, at the same place, maintaining a disorderly house and procuring and permitting evil persons there to conduct themselves to the common nuisance of all the people.

Appellant Shreck was found guilty of only the first count; appellants Cubbage and Devenney were found guilty of only the second count.

At a separate court trial, appellant Philip Silbert was found guilty of the first count. (Appeal No. 297)

II. *Indictment No. 2895* (Appeal No. 298)

Appellants Philip Silbert, Michael Silbert, Bondroff, Shreck, and Wilt were found guilty by a jury of the third count, charging them with conspiracy to violate the lottery laws continuously from June 1, 1966 to November 15, 1967.

At a separate court trial appellant Maurice Silbert was also found guilty of the third count. (Appeal No. 299)

III. *Indictment Nos. 2899, 2900, 2902, and 2903* (Appeal No. 300)

Appellant Shreck was found guilty by a jury of various counts of the Indictments, and under addenda thereto, charging possession of lottery paraphernalia in violation of Maryland Code, Article 27, Section 362, and of the sale of lottery tickets on specified dates to designated persons.

IV. *Indictment Nos. 2908-2910* (Appeal No. 301)

Appellant Philip Silbert was found guilty at a court trial of various counts of the Indictments, and under addenda thereto, charging possession of lottery paraphernalia in violation of Section 362, and of the sale of a lottery ticket to Irv Davis on July 24, 1967.

The cases were consolidated on appeal and present numerous questions, the first of which is whether the lower court erred in denying appellants' pretrial motions for disclosure of the Grand Jury testimony. The motions were based on these facts: The federal agents who testified before the Baltimore Grand Jury in May of 1968 had earlier — on October 23, 1967 — obtained federal search warrants in connection with their investigation of violations of the Federal Wagering Tax laws; and in pursuance thereof, they had searched premises under the control of appellants Philip Silbert, Bondroff, and Shreck, seizing incriminating gambling evidence at that time. Subsequently, in August of 1968 after the Baltimore City Indictments had been returned against the appellants, the Federal District Court in Baltimore held that as a result of the Supreme Court's decisions in *Marchetti v. United States*, 390 U. S. 39, and *Grosso v. United States*, 390 U. S. 62, the federal search warrants were constitutionally defective and, consequently, the government would not be permitted to use, directly or indirectly, any evidence seized under the warrants in any federal or State prosecution involving the defendants in those cases. *Silbert, et al. v. United States*, 289 F. Supp. 318, 320. It was upon this foundation that all appellants claimed a "particularized need" under *Dennis v. United States*, 384 U. S. 855, to review the Grand Jury testimony given by the federal agents to determine whether any of the Indictments were based on evidence seized in October of 1967 in the course of the illegal federal searches. One of the appellants urged in his motion that he was entitled, at the least, to an *in camera* inspection by the court of the Grand Jury testimony, so that the court could determine whether any testimony given by the federal agents related to the illegal searches, and, if so, that it be made available to him. In answer to each of the appellants' motions for disclosure the State claimed that it had not utilized any evidence before the Grand Jury which came within the purview of the federal court ruling in *Silbert* prohibiting use of the proscribed evidence.

Extended pretrial evidentiary hearings were held on the motions to disclose. An Assistant United States Attorney testified that none of the evidence seized in the illegal federal searches was ever made available to State officials. He testified that the ruling in *Silbert* was anticipated prior to the time the federal agents testified before the Baltimore Grand Jury in May of 1968 and that the federal agents were instructed not to testify concerning evidence obtained by the illegal federal searches. The State's Attorney for Baltimore City confirmed the testimony of the federal prosecutor. He stated that the federal agents were made available to him to testify only with respect "to any audio or visual observations" which they made during their investigation between May and October of 1967. He testified that no evidence seized in the federal raids in October of 1967 was made available to the State. There was testimony from the State's Attorney and his Deputy showing that one or the other of them was present throughout the course of the Grand Jury's proceedings, and that no testimony violative of the federal court's ruling was given.

The court was then requested by one of the appellants, with the apparent concurrence of the others, to make an *in camera* inspection of the Grand Jury testimony to determine the question. The record discloses that the court (Prendergast, J.) read the Grand Jury testimony and concluded that nothing in the testimony of the federal agents violated the federal court's order in *Silbert*. Prior to ultimately so concluding, the court had its attention directed by the State's Attorney to five instances in the Grand Jury transcript where some reference, direct or indirect, had been made to the illegal federal raids. The court found such references to be casual and not in violation of the federal court ruling. They were read into the record at the hearing. The references were wholly innocuous and appellants did not otherwise contend. At a later pretrial hearing, the court (Harris, J.) afforded appellants the opportunity to interrogate the federal agents with respect to their testimony before the Grand

Jury. Each agent testified without equivocation that he was under instructions not to testify with respect to evidence seized at the time of the illegal federal raids and each testified that no testimony prohibited under *Silbert* was ever given by him. At the conclusion of their testimony, the court ruled that no evidence offered to the Grand Jury by any of the five agents violated "either the letter or the spirit" of the federal court ruling.

### Disclosure of Grand Jury Minutes

When, and under what circumstances, the minutes of the grand jury may be inspected by a criminal accused has become a thorny issue in recent years. While there is no absolute right to inspect grand jury testimony, *Grimm v. State*, 6 Md. App. 321, 331, a criminal accused may, in a proper case, be afforded access to grand jury minutes if he demonstrates a "particularized need" for disclosure, *Dennis v. United States*, 384 U. S. 855, *Pittsburgh Plate Glass Co. v. United States*, 360 U. S. 395. Thus, the policy favoring grand jury secrecy has not been abandoned; it remains firm except that in some circumstances the ends of justice may require disclosure, the burden resting on the accused to establish the requisite "particularized need" which, among other things, outweighs the reasons underlying the policy of grand jury secrecy. In this latter connection, grand jury proceedings have traditionally been cloaked with secrecy not only to preserve the freedom of inquiry, but to protect the grand jury from outside interference or pressure, and to protect the persons investigated, but not indicted, from falling into public disrepute on the basis of the one-sided presentation of unfavorable evidence to the grand jury. *See Piracci v. State*, 207 Md. 499; *Coblentz v. State*, 164 Md. 558; *In Re Report of Grand Jury*, 152 Md. 616. The question whether a criminal accused has demonstrated a "particularized need" sufficient to permit him to review the minutes of the grand jury is one of fact to be decided in each case; there is and can be no general test. One area peculiarly subject to a showing of "particula-

rized need" justifying a discreet and limited lifting of the grand jury secrecy rule involves the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, or to test his credibility. *See Dennis v. United States, supra; United States v. Socony-Vacuum Oil Co.,* 310 U. S. 150; *Worthy v. United States,* 383 F. 2d 524 (D.C. Cir.); *United States v. Youngblood,* 379 F. 2d 365 (2nd Cir.). In *Wilson v. State,* 4 Md. App. 192, 207, we held that the "particularized need" requirement is one which "relates to the fairness of the trial." We found no such particularized need in *Presley v. State,* 6 Md. App. 419, or in *Grimm v. State, supra. See also Chesley v. State,* 3 Md. App. 588. The cases are collected in an exhaustive Note at 20 A.L.R.3d 7-115, entitled "Accused's Right to Inspection of Minutes of State Grand Jury."

In their quest to inspect the Grand Jury testimony, the appellants asserted a "particularized need" to determine whether the testimony of the federal agents before that body violated the *Silbert* mandate; if it did, it was undoubtedly their purpose to move to dismiss the indictments. Ordinarily, however, the competency of testimony before a grand jury will not be inquired into by the courts and does not furnish a ground to dismiss an indictment. *Pick v. State,* 143 Md. 192; *Grimm v. State, supra; Wilson v. State, supra. Cf.* 20 A.L.R.3d at page 77. That an indictment be founded on illegally obtained evidence does not, in our opinion, *per se* require its dismissal on that ground. If it did, it is likely that persons indicted for crime would uniformly claim a need to pore grand jury minutes to ferret out some instance where illegally obtained evidence was presented to the grand jury, thus ending the tradition of grand jury secrecy. Moreover, it is questionable that the court's ruling in *Silbert* was intended to place sanctions around the use of evidence, illegally obtained, at other than the actual post-indictment prosecution of the case. But assuming that the order in *Silbert* would provide a basis for dismissal of the indictments if its terms were violated, we think the *in camera*

review of the Grand Jury's minutes undertaken by the court, with appellants' concurrence, adequately protected the rights asserted by them in the circumstances of this case.[1] It appears from the record that appellants were satisfied when, after reviewing the Grand Jury testimony, the court concluded that none of the challenged evidence was ever presented to the Grand Jury. While appellants now complain that the *in camera* technique was not adequate, we think in view of the subject matter under review — whether the agents' testimony violated the *Silbert* order—that it was entirely adequate. In so concluding, we recognize that in some cases *in camera* review of grand jury minutes will not suffice to protect the accused's rights, *Dennis v. United States, supra;* but this is not such a case. We have nevertheless ourselves reviewed the Grand Jury testimony and find that nothing therein contained violates the mandate in *Silbert.*[2]

Appellants contend that their motion for disclosure of Grand Jury testimony asserted a "particularized need" to determine whether any evidence was presented to the Grand Jury which resulted from illegal wiretapping, electronic interception, or eavesdropping. Their motion was not as broad as they contend. Only in colloquy with the court during the course of the pretrial hearings was any reference, even obliquely, made to a necessity to review the Grand Jury testimony to determine whether any evidence flowing from illegal wiretapping or electronic interception was presented to the Grand Jury. As part of its *in camera* review of the Grand Jury minutes, the court concluded that no such evidence had been placed before the Grand Jury, and we, too, in our review of the Grand Jury minutes, reached the same conclusion.

Appellants also claim that their motions for disclosure of the Grand Jury testimony asserted a "particularized

1. The only appellants covered by the *Silbert* order were Philip Silbert, Bondroff, and Shreck.

2. The Grand Jury minutes were sealed and made a part of the record in this case. An appropriate order authorizing us to break the seal and review the minutes was executed and is now part of the record.

need" to inspect the minutes to assist them in pursuing their motions for severance and for relief from prejudicial joinder. Nothing in the motions, or in the pretrial proceedings even remotely placed this question in issue in the context of a requirement to review the Grand Jury testimony. If it had, we would have no difficulty in concluding that the appellants had no such right in the circumstances of this case.

Appellants next claim that their motions for disclosure of the Grand Jury testimony were intended to assist them in cross-examining and in impeaching and limiting the testimony at the trial of those witnesses who testified before the Grand Jury. The written motions for disclosure, filed prior to trial, made no such assertion. The record discloses that at the very end of the pretrial hearings, appellant Bondroff made an oral motion to this end on his own behalf. The court deferred its ruling on the motion. At the trial of the conspiracy case, after one of the federal agents, James Lane, had concluded his direct testimony, appellant Bondroff filed a written motion seeking to inspect Lane's Grand Jury testimony. He claimed that there were "certain inconsistencies" in the agent's testimony concerning an inculpatory statement which Bondroff allegedly made. The motion was denied by the court. We think in the circumstances of this case that if it was error not to permit Bondroff to review the testimony, it was harmless. There was massive evidence of Bondroff's involvement in the conspiracy. To have impeached agent Lane's trial testimony on the point at issue—whether it was Bondroff or Philip Silbert who made one particular incriminating statement — would have had little likelihood of destroying Lane's credibility as a witness, or causing the jury to reach a conclusion other than it did. Of course, the other appellants, not having raised the question, can reap no benefit from Bondroff's motion.

Appellants also claim that the court committed prejudicial error when it signed an *ex parte* order permitting the State's Attorney to break the seal of the Grand Jury

testimony and review it in preparation for trial. We see nothing improper. The policy of secrecy of grand jury minutes does not extend to the prosecutor. That he is afforded exclusive access to such minutes to assist him at the trial constitutes no reversible error. *See Dennis v. United States, supra.*

### *The Motions to Discover and Supress Evidence Obtained by Electronic Interception or Eavesdropping*

The appellants claim that the State failed to comply with the court's order requiring it to disclose to them whether the State or federal government engaged in electronic interception or eavesdropping in the course of their investigation of their activities. In response to the court's order, the State denied that any of its agents had done so, and ultimately filed a letter from the United States Department of Justice stating that no federal agents had engaged in any such activities. At the oral argument of the case appellants candidly admitted that even though the letter was made part of the record, they overlooked it. A review of the record indicates clearly that the State fully complied with the court's order, and we thus find no merit in appellants' argument to the contrary.

### *The Conspiracy Convictions*

The six appellants convicted of conspiracy to violate the lottery laws contend that there was no evidence before the jury permitting it to properly find that they conspired in a single conspiracy. They claim that the evidence, at its best, indicated the existence of multiple conspiracies, some of which bore no relation to each other. Appellants offer nothing beyond this generalization in the way of argument, other than to claim that the only "common thread" that joins them together is the evidence showing that Philip Silbert visited both the Florida Bar and Harold's Club, establishments where the other appellants were engaged either as proprietor, patrons, or employees.

We think there was sufficient evidence to justify the court denying appellant's motions for judgment of acquittal and permitting the case to go to the jury. The case required ten days to try; the transcript of testimony runs almost 2,000 pages. There was evidence showing that federal agents operated at Harold's Club and at the Florida Bar in undercover roles over the summer and early fall of 1967. Their testimony, based on observations which they made, and conversations which they heard, principally within the two bars, showed the existence of a lottery operation touching both establishments, with appellants Philip Silbert and Bondroff as operating heads, Shreck as a writer-runner, and appellants Maurice Silbert, Michael Silbert, and Delores Wilt as other functionaries within the operation. See *State v. Swales, Welch and Bowman,* 12 Md. App. 69, for an in-depth review of the operation of a lottery syndicate. It would serve little purpose to recite the massive evidence of conspiracy to violate the lottery laws which the State presented in this case. Suffice it to note that, if believed by the jury, the evidence adduced at trial established the crime of conspiracy within the guidelines of such cases as *Seidman v. State,* 230 Md. 305; *Regle v. State,* 9 Md. App. 346; *Wilson, Valentine & Nutter v. State,* 8 Md. App. 653, and *Jones v. State,* 8 Md. App. 370. In so concluding, we are mindful of the rule, which is particularly applicable in this case, that to establish a conspiracy, it is not necessary that there be any formal agreement manifested by formal words, written or spoken; it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose and this may be inferred from sufficiently significant circumstances. As to appellants' generalization that, at best, only multiple conspiracies were shown, we think the observation made in *Scarlett v. State,* 201 Md. 310, 316, is applicable to the evidence in this case, namely that "where a conspiracy contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, such continuous cooperation is a single conspiracy, rather than a series of distinct conspiracies."

## The Disorderly House Convictions

The seven appellants convicted under the disorderly house indictment claim only that "State witnesses were permitted to testify as to statements made by one defendant that implicated other defendants, when such statements or admissions were made out of the presence of the other defendants." Beyond this statement, appellants make no complaint with respect to the propriety of their disorderly house convictions.

The State claims that in view of the thousands of pages of transcript involved in the case, neither it, nor this court, should undertake to determine exactly what statements appellants are complaining about, whether proper objections were made, or whether reversible prejudice resulted.

We think the State's position is well taken and that at best appellants make a bald allegation, one not requiring us to search through the record in an effort to find error beneficial to them. We have, however, reviewed the record in the disorderly house cases and find legally sufficient evidence that appellants were conducting a disorderly house at the Florida Bar, as charged in the indictment.

## Convictions for Sale of Lottery Tickets
### Appellant Philip Silbert

Indictment 2908 charged that appellant Philip Silbert, on July 24, 1967, "unlawfully did sell a lottery ticket to Irv Davis." Silbert claims that as there was no evidence that he sold a lottery ticket to Davis, the court erred in not granting his motion for judgment of acquittal.

The evidence at the trial showed that federal agent James Lane, acting in an undercover capacity, went almost daily to Harold's Club between June and October of 1967. Lane became acquainted with Irv Davis, who, like himself, also frequented Harold's Club on a daily basis. Lane testified with respect to observations made by him in Harold's Club prior to July 24, 1967 which led him to conclude that a lottery operation was there being con-

ducted. He observed that Silbert and Davis were very friendly and would talk together at the Club about numbers; and that on July 24 Davis asked Silbert, who was then in the Club, what the number was, to which Silbert responded by saying "695." Thereafter, according to Lane:

> "Davis approached Philip Silbert with his Bar check. He showed him his Bar check and said he wanted to play his check number, 964, but he didn't have any money. Silbert glanced at the check and said: 'Don't worry, Irv, you are on.' "

Lane testified that there was no transfer of any physical object between Davis and Silbert. He admitted that he did not overhear the amount of the bet which Davis placed with Silbert. Lane's extensive experience in lottery investigations having been established, he characterized the July 24 transaction in these terms:

> "I observed Irv Davis take a chance on the lottery, buy a ticket, in essence."

Lane explained:

> "The sale of lottery tickets can involve anything from an actual ticket to the promise to pay on a given number. It runs the gamut depending on the type of operation, the individual involved, their relationship between one another; it can constitute just about anything so long as the fact is that a three digit number is indicated, and a promise to pay is apparent in the individual who receives the bet."

Lane also testified that the buyer does not always pay for his number at the time the sale is made; that it depended upon the relationship between the individual accepting the wager and the person betting.

Maryland Code, Article 27, Section 356, prohibits the sale of lottery tickets in this State. It specifies:

"No person shall draw any lottery or sell any lottery ticket in this State; nor shall any person sell what are called policies, certificates or anything by which the vendor or other person promises or guarantees that any particular number, character, ticket or certificate shall in any event or on the happening of contingency entitle the purchaser or holder to receive money, property or evidence of debt."

Section 357 provides:

"All devices and contrivances designed to evade the provisions of § 356 of this article shall be deemed offenses against it."

Section 368 provides:

"The courts shall construe the foregoing provisions relating to lotteries liberally, and shall adjudge all tickets, parts of tickets, certificates, or any other device, whatsoever, by which money or any other thing is to be paid or delivered on the happening of any event or contingency, in the nature of a lottery, to be lottery tickets."

Section 610 provides that in any indictment for the "selling of lottery tickets or other device in the nature thereof, it shall not be necessary to set forth * * * the particular scheme of lottery, but it shall be sufficient if the indictment sets forth that the defendant * * * sold a 'lottery ticket,' * * * but the defendant may, by application to the State's Attorney, obtain a statement more particularly describing the offense intended to be proved under such indictment."

Appellant Silbert claims that to convict him for "selling a lottery ticket," as charged in the indictment, the State must show that "there was a sale of some tangible instrument or thing by which money may be lost or won, as distinguished from the game itself." He claims that to be a "device" or "contrivance" under Section 357, it

must, like a ticket, be a tangible instrument or thing and not merely the taking of a bet. He urges that devices and contrivances under Section 357 must be construed to be "something physical; some piece of paper, some token, some coin, some substitute for a ticket, a conventional ticket, a policy." In other words, Silbert claims that only evidence that a physical ticket was sold will suffice to establish his guilt of the offense; that the statute prohibits the selling of a "ticket" and had it meant something less than that, the legislature would have so stated.

A lottery is a species of gaming, the classic elements of which are consideration, chance, and prize. *Bender v. Arundel Arena,* 248 Md. 181. More specifically, "[t]he fundamental point [of a lottery] is that in each case there is the offering of a prize, the giving of a consideration for an opportunity to win the prize, and the awarding of the prize by chance." *Shelton v. State,* 198 Md. 405, 410, quoting from *Forte v. United States,* 83 F. 2d 612 (App. D.C.). By its enactment of Sections 356, 357 and 368, heretofore quoted, making it unlawful for any person to "draw any lottery" or to "sell any lottery ticket" it was the obvious intention and unmistakable purpose of the Legislature to broadly inhibit the creation, sponsorship, promotion, conduct, and operation of lotteries. Thus, in *Smith v. State,* 68 Md. 168, where the defendant was charged with having sold a lottery ticket, but the evidence showed that he had sold "pieces of paper," commonly known as "policies," the court referred to what is now Section 368, requiring a liberal construction of the lottery laws, and concluded:

> "* * * it is the duty of this Court to decide that any device whatsoever, by which money or any other thing is to be paid or delivered on the happening of any event or contingency in the nature of a lottery, to be a lottery ticket."

In *Ballock v. State,* 73 Md. 1, the defendant was convicted for selling a lottery ticket. The proof showed that

he sold an instrument called an "Austrian Government Bond," in a lottery scheme used to promote the sale of that country's bonds by paying each year a premium on the amount of the bond if the number appearing on it was drawn. The court, in equating the bond to a lottery ticket, said: (page 4)

> "Our statute allows the sale of nothing which, on the happening of a contingency 'in the nature of a lottery,' brings pecuniary benefit, which would not be enjoyed but for the chance falling to the holder. Courts are required by sec. 184 [now Section 368] to construe the provisions liberally in order to reach and suppress the evil; and they are required to hold 'anything' to be a lottery ticket which, on the happening of such event or contingency in the nature of a lottery, entitled the holder to money or property."

In *State v. Friedman*, 52 A. 2d 416 (N.J.), the accused had been charged with selling "tickets, chances and shares" in a lottery in violation of statute. The accused maintained that there had been no sale because no delivery of a ticket had been shown. The court concluded that while there had been no delivery of a lottery ticket, such was not the essence of the offense denounced by the statute and charged in the indictment. It held: (page 418)

> "* * * A lottery within the concept of the statute is a scheme for the distribution of prizes by lot or chance; and a lottery ticket is merely the evidence or token of the holder's participation in the lottery and the number which determines his right to share in the distribution resolved by chance after the sale. The actual delivery to the purchaser of a memorandum of the sale of a share in the lottery is not an essential ingredient of the crime. The statute

> strikes at the lottery; and to hold that the sale of a share or interest therein is not within its terms, unless accompanied by a delivery to the purchaser of the written memorandum of the transaction, would provide the means for its evasion and the frustration of its obvious policy, and this is a construction to be rejected unless clearly unavoidable. The rule of strict construction of penal statutes, according to the letter, does not justify a disregard of the manifest legislative intention."

To like effect, see *State v. De Stasio,* 229 A. 2d 636 (N.J.) ; *People v. Cuda,* 3 Cal. Rptr. 86 (Cal. App.).

The offenses of drawing a lottery or selling a lottery ticket, proscribed by Section 356, reside not in the method by which the lottery is drawn, or in the form in which the lottery ticket is sold, or in the manner in which the sales transaction is concluded, but rather in the substantive acts showing, without regard to method or form, that a lottery is being conducted and chances sold in furtherance of the lottery scheme. The notion that to constitute a prohibited "lottery ticket" it must be shown that such an object was delivered to the bettor to evidence his bet has long been dispelled by decisions of the Court of Appeals, recognizing that a "lottery ticket," in the parlance of that pernicious business, need not be an object delivered to the bettor to evidence the sale; but may comprise a slip of paper upon which the lottery operator has recorded bets that he has taken. See *Gatewood v. State,* 244 Md. 609; *Warren v. State,* 231 Md. 240; *Martini v. State,* 200 Md. 609; *Moore v. State,* 199 Md. 676; *Purviance v. State,* 185 Md. 189. While a "ticket" is normally considered to be a written document of some kind, we hold that a "lottery ticket," within the contemplation of the Maryland statutory scheme prohibiting the sale thereof, is not necessarily limited to a physical object; rather, in the sense used in Section 356, as broadened by the provisions of Section 357,

and requiring liberal interpretation under Section 368, a "lottery ticket" represents anything, tangible or intangible, by which the sale of a chance or share in a lottery is manifested. It may constitute a mere exchange of words between the lottery operator and the bettor by which they agree upon the terms under which a chance or share in the lottery is being acquired. Indeed, as we noted in *State v. Swales, Welch and Bowman, supra,* at page 76, in many instances lottery operators give out no tickets, and make no notations; rather, they rely on their memory "long enough to get to the nearest telephone." We believe then that it makes no difference whether the bets are committed to paper or not; that where it is shown by legally sufficient evidence that a lottery operator has by any method sold a chance on a lottery, he has under Section 356 in effect sold a "lottery ticket." To otherwise interpret Sections 356, 357, and 368 would be to do violence to the clear legislative intent and would enable lotteries to flourish beyond the law by exalting form over substance. We find nothing in the provisions of these Sections which, under the rule of *Ejusdem Generis,*[3] would require, as Silbert contends, that a "lottery ticket" must be interpreted to mean a physical object.

Silbert also urges that because there was no evidence to show that Irv Davis paid any consideration for the "lottery ticket" he allegedly sold him on July 24, no "sale" was proved and, consequently, his conviction must be reversed. We find no merit in the contention. While consideration is a necessary element in a lottery, a lottery wager may be made on credit. *State v. Swales, Welch and Bowman, supra.* If it is, we think it constitutes an adequate consideration since it implies a promise to pay in the future. From his conversation with the appellant, the jury could find that Davis fully appreciated the ne-

---

3. The rule commands that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. Bl. Law Dict., 3d Ed. 645.

cessity for making payment at a later time and that a "charge account" type sale had in fact been made.[4]

### Appellant William Shreck

Shreck was convicted of selling lottery tickets to Connie Devenney and Delores Wilt on September 12, 1967 and again to Devenney on September 19, 1967 and October 18, 1967.

Agent Edward Kelley was the State's only witness in the case. He testified that in his undercover role as a patron at the Florida Bar he was present on the premises approximately four or five days each week between May and October of 1967; that on September 12 Shreck came into the Bar and Devenney, an employee, handed him some change and said "723"; that Wilt, another employee, gave Shreck some coins and said "613"; that Shreck then went to the rear of the Bar and made a phone call, after which he returned with a small slip of white paper, ripped it up and told Wilt to throw it away.

Kelley testified that on September 19, while he was in the Florida Bar, Devenney went to the door and called for Shreck, who shortly thereafter arrived on the premises. Devenney said to Shreck: "What was it yesterday?" Shreck responded, but Kelley was unable to hear what was said. But Devenney then gave Shreck money and said: "Same thing today and tomorrow." Shreck then made a phone call.

On October 18 Kelley again observed Shreck in the Bar and heard Devenney say to him "712—50¢ today and tomorrow." Shreck responded: "o.k., give me the buck." She did and he left.

Kelley had been involved in approximately one hundred prior lottery investigations and testified with respect to how a lottery operation was conducted. The court considered him an expert witness. While Kelley did not see any ticket given by Shreck to Devenney or Wilt, he

---

4. There was expert testimony showing that the usual lottery wager was from twenty-five cents to a dollar, and that payment on a "hit" was calculated on the basis of seven hundred times the amount of the bet.

characterized the transactions between them as bets — the sale of lottery tickets—that "the individual placed the bet and made the purchase of a lottery ticket with the seller."

We think Kelley's testimony, if believed, sufficient to establish that Shreck sold "lottery tickets" to Devenney and Wilt, as charged in the indictment. Consequently, the court did not err in denying Shreck's motions for judgment of acquittal on these counts of the indictments.

### The Denial of Appellant Shreck's Pretrial Motions

Shreck contends that the court erred in denying his request for removal. He claims that prejudicial pretrial newspaper publicity made it impossible for him to obtain a fair trial. The court considered the alleged prejudicial newspaper publicity and determined that it did not warrant a removal. An opportunity was afforded the appellant for extensive *voir dire* examination of the jury. From our review of the record, we cannot say that the court abused its discretion in denying the removal request. See *Bromwell v. State,* 8 Md. App. 382; *Laws v. State,* 7 Md. App. 84; *Sizemore v. State,* 5 Md. App. 507.

Appellant also claims that the court erred in denying his motion to disqualify the trial judge from presiding at the trial. The motion was based on the claim that the judge had presided at two related trials—the conspiracy and disorderly house cases—and that the evidence to be adduced would be similar to that presented in those cases. Appellant claims that the judge should have disqualified himself, even though the case was being tried before a jury, because he had previously ruled on questions of law and the admissibility of evidence.

No bias or prejudice being shown on the part of the trial judge, we think the motion was properly denied. The judge had made no ruling in the earlier cases involving the substantive question of guilt or innocence. The mere fact that he made rulings on questions of law, and the admissibility of evidence in the earlier cases

would not disqualify him. See *Laws v. State, supra; Stallard v. State*, 6 Md. App. 560; *Day v. State*, 2 Md. App. 334.

Appellant claims that the court erred in not granting his motion to sever his six substantive lottery cases from trial before a single jury. On the record before us, we cannot say that the trial judge abused his discretion in not ordering separate trials. See *Wilson, Valentine & Nutter v. State, supra; DiNatale v. State*, 8 Md. App. 455; *Jennings v. State*, 8 Md. App. 312.

Appellant Shreck also complains that the State's witness Kelley was permitted to testify as an expert in lottery operations without first having qualified as such. On the record before us, we think the agent's expertise was sufficiently demonstrated to permit the court to consider him an expert in lottery operations. See *Gatewood v. State, supra; Spriggs v. State*, 226 Md. 50; *Chernock v. State*, 203 Md. 147; *Johnson v. State*, 8 Md. App. 187.

### *Unlawful Possession of Lottery Paraphernalia*
### *Philip Silbert*

Appellant Philip Silbert was convicted of possessing lottery paraphernalia in violation of Section 362 of Article 27 on August 8, 1967 and again on September 18, 1967. He contends that the evidence was insufficient to sustain either conviction.

In pertinent part, Section 362 provides:

> "* * * if any person shall have in his possession in this State any book, list, slip or record of the numbers drawn in any lottery, * * * or any book, list, slip or record of any lottery ticket, or anything in the nature thereof mentioned in this section, or of any money received or to be received from, or for the sale of any such lottery ticket or thing in the nature thereof * * *[he shall be subject to conviction therefor]."

The evidence at the trial showed that late in the after-

noon of August 8, 1967 Agent Lane was in Harold's Club with Irv Davis and Silbert. Lane told Silbert that he was a computer salesman. Silbert asked Lane whether he could get a computer to figure out "a specific three digit number." In response to Lane's request for clarification, Silbert said:

> "Take today for instance. The number is 971. I have a lot of people turning in to me. Would it be possible to find out how much was paid on that number."

In answer to Silbert's question, Lane told him that "it would depend on the total number of digits to be programmed." Silbert asked Lane how long this would take. Lane replied that it would depend on the number of digits. Lane testified:

> "At this point, Mr. Silbert took a piece of lined loose leaf paper from his pocket and showed it to me, and asked if it could be used in a computer. I examined the paper and it contained a series of names and after each name was a three digit figure, a numerical figure. The bulk being in the three digit range with a few in the four digit range."

Lane testified that the figures indicated "money figures." He said:

> "* * * After approximately each six names the amount next to the names were totalled and the page was complete, so there were possibly four series of six names on the sheet, and after each six names the figures would be totalled. Specifically, I remember the name Jack and the figure 650 written next to it. Again, Mr. Silbert wanted to know if this type of information, this type of paper could be used in a computer, and I told him that that information would have to be recorded on punch cards; that it wouldn't be

possible to use loose leaf paper. At this point Mr. Silbert asked me wouldn't it be possible to have the writers write on punch cards, and again I told him key punches would have to be used with magnetic ink. It would be impossible to have individuals on the street writing on punch cards. At that point Mr. Silbert mentioned in handwriting, that this would be a problem also, and I agreed with him. At this point I asked Mr. Silbert how much he would be willing to pay for such a computer, and he told me not to worry about the price."

Based on his experience in lottery investigations Lane said that the document which appellant showed him was "a tally sheet." He explained that it provided "the total amounts played for a given period, total amounts turned in by each writer and/or controller for the given period." Lane testified that the document in Silbert's possession on August 8 contained "a series of names and written to each name was a dollar figure, the bulk being in the three hundred dollar range- - -or three digit range, but a few were in the four digit range."

Lane further testified that on September 18, 1967 he was with Davis and another person in Harold's Club late in the afternoon when Davis approached Silbert and asked him: "What do you have so far?" Silbert responded: "Seven and two." Lane testified that Silbert went into the office and shortly thereafter returned and sat with them. In answer to Davis's question "what is it," Silbert said: "Nine." Davis then said to Silbert: "I want to take care of him," and he began to go through a series of three digit numbers. According to Lane, Silbert then said: " 'Wait a second, wait a second,' and he took a three by five piece of paper or pad of paper, at least a few sheets, and began to record the numbers as Mr. Davis called them off to him, the first two digits being one, three, four and one, three, seven. After the series of digits were related to Mr. Silbert, they con-

versed in a very low tone for approximately a minute together at the bar, and then Mr. Silbert put the paper in his pocket."

The right of a police officer, experienced in such matters, to give testimony as to the meaning of figures and words appearing on alleged gambling paraphernalia has long been established. See *Gatewood v. State, supra; Spriggs v. State, supra; Chernock v. State, supra; Johnson v. State, supra.* That Lane had sufficient expertise in lottery matters to interpret the paraphernalia in Silbert's possession on August 8 and September 18, 1967 cannot seriously be questioned. His observations, given in evidence, of the conduct of a lottery operation at Harold's Club on dates other than those charged in the indictment were properly to be considered by way of background in assessing the character and meaning of the objects possessed by Silbert on August 8 and September 18. We think the court was not clearly erroneous in its judgment finding that Silbert was in possession of lottery paraphernalia within the ambit of Section 362, as charged in the indictments. In so concluding, we have considered, but find no merit in Silbert's contentions that he could not be convicted unless the State actually produced the physical paraphernalia in evidence. See *Lambert v. State,* 196 Md. 57; *McGee v. State,* 1 Md. App. 239. Compare *Williams v. State,* 7 Md. App. 5.

### William Shreck

Shreck was convicted under Indictments 2899 and 2900 of unlawfully possessing lottery paraphernalia on September 12, 1967 in violation of Section 362, presumably on the basis of the evidence showing that immediately after he sold "lottery tickets" to Wilt and Devenney he made a phone call, after which he returned and produced a small slip of white paper, ripped it up and then had Wilt discard it. There being no other evidence in the case, or any inferences properly to be drawn from such evidence, we think the court erred in not granting Shreck's motions for judgments of acquittal as to those counts.

*Appellant Bondroff's Supplemental Brief*

After the appellants' joint brief had been filed, and the State had prepared its brief in response, appellant Bondroff sought by supplemental brief to raise an additional question pertaining to his conspiracy conviction, namely that the misconduct of the prosecutor in disseminating prejudicial information to the press during the course of the trial constituted reversible error. Claiming that the contention was not timely asserted, the State declined to answer it. The State points out that the trials were completed in early 1969, but appellants' brief was not filed until February 5, 1971.

There is no provision in the Maryland Rules for the filing of a supplemental brief. *Lindsay v. State,* 8 Md. App. 100; *Simms v. State,* 4 Md. App. 160; *Jones v. State,* 3 Md. App. 608. While Bondroff's failure to include the contention in the appellants' joint brief may have been an oversight, in the posture of this case we decline to consider the contention on its merits.[5]

> *As to indictment 2893 (appeals # 217 and 297):*
>
> *all judgments affirmed; appellants to pay costs.*
>
> *As to indictment 2895 (appeals # 298 and 299):*
>
> *all judgments affirmed; appellants to pay costs.*
>
> *As to indictments 2899, 2900, 2902, and 2903 (appeal # 300):*
>
> *all judgments affirmed, except as to the first count of indictments 2899 and 2900, as to which the judgments are reversed; appellant to pay costs.*
>
> *As to indictments 2908, 2909, 2910 (appeal # 301):*
>
> *all judgments affirmed; appellant to pay costs.*

---

5. On July 31, 1969 Bondroff's one-year sentence was suspended.