STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. McARTHUR CORBITT, DEFENDANT-APPELLANT.

Argued February 22, 1977—Decided October 6, 1977.

*Mr. James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. R. Benjamin Cohen,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. David S. Baime,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Baime* and *Ms. Jane E. Deaterly,* Deputy Attorney General, of counsel and on the brief).

*Mr. Forrest R. Goodrum* filed a brief on behalf of *amicus curiae* American Civil Liberties Union (*Ms. Marilyn J. Morheuser,* of counsel).

The opinion of the court was delivered by

Conford, P. J. A. D., Temporarily Assigned. At issue in this case is the constitutionality of the sentencing scheme of the New Jersey murder statute, *N. J. S. A.* 2A:113–3 and *N. J. S. A.* 2A:113–4, as judicially altered in *State v. Funicello,* 60 *N. J.* 60 (1972) (*"Funicello* III"), *cert.* den. *sub nom. New Jersey v. Presha,* 408 *U. S.* 942, 92 *S. Ct.* 2849, 33 *L. Ed.* 2d 766 (1972). Defendant asks the Court to find: (1) that under *United States v. Jackson,*

390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138 (1968), the sentencing scheme of the act impermissibly infringes upon an accused's Fifth Amendment right not to plead guilty and his Sixth Amendment right to a jury trial; and (2) that, apart from the *Jackson* rule, the scheme deprives an accused of the equal protection of the laws.

In view of the limitation of the issues herein by our order of certification, the factual background may be capsulated. On May 11 and 13, 1972 fires occurred at a Newark multi-family dwelling. A visitor at the premises died from smoke inhalation because of the second fire. Defendant confessed to setting both fires to obtain revenge against his landlord. On April 10, 1973 a jury acquitted defendant of arson in relation to the May 11 fire but it found him guilty of arson in connection with the May 13 fire and of murder of the visitor. The murder charge had been tried on a felony murder theory. Defendant was sentenced to life imprisonment for the murder and given a concurrent five to seven year prison sentence for the arson.

On appeal the Appellate Division, in an unreported opinion, affirmed the murder conviction but vacated that for arson on grounds of merger. We granted certification but expressly "limited to the question of the validity of the mandatory life sentence upon a jury conviction for murder." 69 *N. J.* 447 (1976).

I

*Alleged Infringement upon Fifth Amendment and Sixth Amendment Rights.*

█ The basic issue before us is whether the decision in *United States v. Jackson, supra,* which held unconstitutional the death penalty provision of the Federal Kidnapping Act under the sentencing scheme of the act, condemns as invalid our murder sentencing scheme as revised by this Court after the statute, with a provision for a death penalty, was held unconstitutional by the United States Supreme Court in *Funi-*

*cello v. New Jersey,* 403 *U. S.* 948, 91 *S. Ct.* 2278, 29 *L. Ed.* 2d 859 (1971) (*"Funicello* II") Comprehension of the opposing views in the case requires our outlining the history of the litigation over the validity of the murder statute before and after its judicial recasting in *Funicello* III.

## A

Prior to *Funicello* III our statutes[1] concerning pleading and sentencing for murder read as follows:

*N. J. S. A.* 2A:113-3

In no case shall the plea of guilty be received upon any indictment for murder, and if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case.

Nothing herein contained shall prevent the accused from pleading non vult or nolo contendere to the indictment; the sentence to be imposed, if such plea be accepted, shall be either imprisonment for life or the same as that imposed upon a conviction of murder in the second degree.

*N. J. S. A.* 2A:113-4

Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.

Every person convicted of murder in the second degree shall suffer imprisonment for not more than 30 years.

Judgments of death were pronounced under those statutes upon Leo R. Forcella and Victor R. Funicello and affirmed on direct appeal in *State v. Forcella,* 35 *N. J.* 168 (1961), *cert.* den. 369 *U. S.* 866, 82 *S. Ct.* 1035, 8 *L. Ed.* 2d 86 (1962) and *State v. Funicello,* 49 *N. J.* 553 (1967) (*"Funicello* I"), *cert.* den. 390 *U. S.* 911, 88 *S. Ct.* 837, 19 *L. Ed.* 2d 882 (1968). Post-conviction proceedings were brought by both,

---

[1]The Legislature has passed a bill to revise the statutes concerning murder which provides for imposition of the death penalty in certain cases. Senate No. 639. It is awaiting action by the Governor.

and before their final disposition the United States Supreme Court decided *United States v. Jackson, supra* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138.

*Jackson* involved a death sentence under the Federal Kidnapping Act. That statute provided that kidnapping and interstate transportation of the victim should under specified circumstances be punished by death if the verdict of the jury should so recommend or by imprisonment for any term of years or for life if the death penalty was not imposed. As the statute was construed, the death penalty could not be imposed upon a defendant who waived jury trial or pleaded guilty. The Supreme Court held the death penalty provision invalid, but severable from the remainder of the act. It reasoned that since a defendant could assuredly avoid the death penalty only by pleading guilty or proceeding to trial before a judge, he was "needlessly encourage[d]" to waive his constitutional rights not to incriminate himself, as by a plea of guilt (Fifth Amendment) and to have a jury trial should he plead not guilty (Sixth Amendment). 390 *U. S.* at 583, 88 *S. Ct.* 1209. While recognizing the Legislature's legitimate interest in permitting a jury to mitigate the rigors of capital punishment, the Court felt that goal could not be pursued by "penalizing those defendants who plead not guilty and demand jury trial". *Id. at* 582, 88 *S. Ct.* at 1217. It cited state statutes which make the jury the arbiter of capital punishment no matter how the defendant's guilt is determined. *Ibid.*

Forcella, Funicello and others similarly situated brought the *Jackson* holding to the attention of the New Jersey courts in their post-conviction proceedings, arguing that it was direct authority for the invalidity of the death penalty provision in our murder statute in that only upon a trial did a defendant risk a verdict of death, not by offer and acceptance of a plea of *non vult*. Thus there existed the same needless "chilling", as in *Jackson*, of the right to contest guilt and to have a jury at the trial of the issue. In an opinion by Chief Justice Weintraub for a majority of the Court, the argu-

ment was rejected, *Jackson* being distinguished. *State v. Forcella,* 52 *N. J.* 263 (1968). It was pointed out that our statutory scheme differed from that in *Jackson* because a defendant could not be tried by a judge but only before a jury, and therefore the Sixth Amendment claim was without merit. *Id.* at 270–272. The purpose of the provision was "humane" and not a "needless" discouragement of the right to contest guilt, as in *Jackson,* and thus the Fifth Amendment was not offended. *Id.* at 280.

Justices Jacobs and Hall dissented. They concluded that *Jackson* compelled the elimination of the death penalty from the New Jersey sentencing scheme but that the statute could be rehabilitated by substituting life imprisonment therefor, without the necessity of scrapping the defendant's option to offer to plead *non vult* and be allowed the potential of a lesser penalty. 52 *N. J.* at 294–302.

On petition for *certiorari* the United States Supreme Court summarily, and without argument, reversed the *Forcella* holding three years later in a brief memorandum whose substantive content was confined to the statement:

Judgment, insofar as it imposes the death sentence, reversed and case remanded to the Supreme Court of New Jersey for further proceedings. *Funicello v. New Jersey,* 403 *U. S.* 948, 91 *S. Ct.* 2278, 29 *L. Ed.* 2d 859 (1971) (*"Funicello II"*).

The only explanation given for the ruling was the citation of *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968), and similar cases[2] and of the *Jackson* case.

Upon remand to this Court, in *Funicello III, supra* (60 *N. J.* 60), the Court "accept[ed] the conclusion that the

---

[2]Those cases held that a venireman in a capital case should not be excused for cause solely because he expressed opposition to the death penalty and entertained conscientious scruples against inflicting it. This was not a real issue in the New Jersey cases. See *Funicello* III (60 *N. J.* at 67).

United States Supreme Court has declared the death penalty to be unconstitutional under our statute". *Id.* at 67. Considering the provision for the death penalty severable from the statute, the Court ordered all death sentences vacated, and it directed that all pending or future indictments for murder be prosecuted on the basis that upon the jury's verdict of murder in the first degree the penalty should be life imprisonment. Pleas to an indictment for murder were to continue to be governed by *N. J. S. A.* 2A:113-3. Id. at 67-68. In effect, the Court adopted the position of the dissenting Justices in *State v. Forcella, supra.*

The United States Supreme Court denied *certiorari* to review that determination. *New Jersey v. Presha, supra* 408 *U. S.* 942, 92 *S. Ct.* 2849, 33 *L. Ed.* 2d 766.

Viewed in relation to the rationale of *Jackson,* the following possibly pertinent differences are apparent between the sentencing scheme under the federal kidnapping statute dealt with in *Jackson* and that of our present statute,[3] as recast by our courts: (1) there was a possibility of a death penalty after conviction under the federal act; only life imprisonment under ours; (2) the maximum punishment after conviction under the federal act was greater than that upon a plea of guilt; the maximums are the same under our act; and (3) trials by either judge or jury were available under the federal act, with the possibility of the maximum penalty (death) only when the trial was with a jury; under our statute a trial can be only by jury.

The State contends that differences (1) and (2) are each sufficient to distinguish our statute from the federal one and to justify a conclusion that ours imposes no "needless" burden on the defendant's Fifth Amendment rights, such as prohibited by *Jackson.* It also argues that difference (3) precludes the conclusion of infringement upon Sixth Amend-

---

[3]References to our present statute are to be understood in the light of the recasting thereof by the Court in *Funicello* III.

ment rights. The defendant argues that the substantial difference in potential *minimum* sentences between that upon conviction after trial and that upon a plea of *non vult* under our statute is such as to render operative the rationale of *Jackson* insofar as infringement upon Fifth Amendment rights is concerned; and, moreover, that any impermissible burden on the option of the defendant to go to trial at all necessarily also burdens the Sixth Amendment right to have a jury trial.

As we view the basic underlying question posed by defendant's contention, it is whether the doctrine of *Jackson* constitutionally precludes a statutory sentencing scheme for murder wherein provision for a fixed sentence (less than death) on a conviction may co-exist with one for the taking of a plea of *non vult* (or guilt) with the possibility of the sentencing court imposing a substantially lesser sentence. The defendant responds to that question in the affirmative. He regards any substantial statutory inducement to plead rather than go to trial as *ipso facto* invalid. Our study of the cases, particularly decisions of the United States Supreme Court subsequent to *Jackson,* satisfies us that the correct conclusion is to the contrary and that our present statute is unexceptionable on either Fifth or Sixth Amendment grounds.

*B*

The Sixth Amendment problem need not long detain us. In *Jackson,* the right to a jury trial was implicated because trial before a judge rather than a jury assured immunity from a death sentence. If the contrast between one method of trial involving the possibility of death (jury trial) and another free from it imposes an intolerable and needless pressure on the defendant to choose the latter, as held by *Jackson,* the right of trial by jury was of course compromised.[4] But if, as

---

[4] Accord: *Spillers v. State,* 84 *Nev.* 23, 436 *P.* 2d 18 (Sup. Ct. 1968) (rape accompanied by extreme violence and great bodily harm

under our statute, the defendant is triable only by jury, if at all, no invasion of the right of jury trial, as such, is apparent. *State v. Forcella, supra,* 52 *N. J.* at 269–270. If, however, because of the New Jersey statutory option of a defendant to tender a plea of *non vult,* which, if accepted, has the potential of a sentence substantially less than on conviction, of first degree murder, defendant has suffered intolerable and needless discouragement of his right to go to trial at all, then defendant has necessarily suffered infringement of both his Fifth and Sixth Amendment rights. But if, on the other hand, it is concluded that whatever discouragement is involved in the scheme is not an impermissible infringement on Fifth Amendment rights, so that the provision for a plea of *non vult* is valid, the Sixth Amendment question becomes moot. The latter issue is thus determinative of the entirety of the *Jackson* phase of the case.

*C*

We consider, first, the merits of the State's position that the *Jackson* problem is satisfactorily resolved by the circumstance that under the statute the defendant is subject to the same maximum sentence whether he is convicted or pleads *non vult* — *i. e.,* life imprisonment. It is pointed out that under the federal kidnapping act, by contrast, the potential maximum on a plea of guilty was less than on a conviction at a jury trial. The argument is that *Jackson* emphasized the certainty of avoidance by a plea of the potential maximum after a trial. The Appellate Division has upheld the State's thesis. *State v. Hubbard,* 123 *N. J. Super.* 345, 351–352 (1973), certif. den. 63 *N. J.* 325 (1973); *State v. Land.* 124 *N. J. Super.* 303, 306 (1973). It has also so been held uniformly elsewhere. *Commonwealth v. Hargrove,* 434 *Pa.* 393, 254 *A.* 2d 22 (Sup. Ct. 1969); *Sims v. Eyman,* 405 *F.*

subject to imprisonment for not less than 20 years, or death if so declared by jury; trial by bench available on waiver by state and defendant).

2d 439 (9 Cir. 1969); *State ex rel. Strickland v. Melton.*
152 *W. Va.* 500, 165 *S. E.* 2d 90 (Sup. Ct. App. 1968);
*State v. Harper,* 251 *S. C.* 379, 162 *S. E.* 2d 712 (Sup. Ct.
1968); *cf. State v. Beal,* 470 *S. W.* 2d 509 (Sup. Ct. Mo.
1971); *Lyons v. Howard,* 434 *F.* 2d 632 (6 Cir. 1970);
*People v. Coogler,* 71 *Cal.* 2d 153, 77 *Cal. Rptr.* 790, 454 *P.*
2d 686 (Sup. Ct. 1969), *cert.* den. 406 *U. S.* 971, 92 *S. Ct.*
2417, 32 *L. Ed.* 2d 672 (1972).

We are not, however, persuaded that the point thus made
is necessarily dispositive of the *Jackson* thrust. If the in-
variable or almost invariable practice were to accord the plead-
ing defendant a substantially lesser sentence than that man-
dated on a conviction, the argument of pressure to avoid a
trial by pleading guilty (aside from the other distinguishing
considerations later to be discussed herein) would have
logical merit even though the statute facially allowed imposi-
tion, on the taking of a plea, of the same penalty required in
case of conviction after trial. See *Commonwealth v. Hargrove,
supra,* 254 *A.* 2d at 24; *cf. Roman v. Parrish,* 328 *F. Supp.*
882 (E. D. Va. 1971). We need not pursue the point, how-
ever, as we are convinced, for reasons to be fully stated, that
the *Jackson* case is not today authority for unconstitutionality
where the maximum sentence imposable on conviction after
trial is less than death; or, that if the principle is not auto-
matically inapplicable in such a case, the New Jersey sentenc-
ing scheme is nevertheless valid notwithstanding the incidence
of some encouragement or pressure on a defendant to plead
guilty. We proceed with our reasons for those conclusions.

### D

On its face, the opinion of the Court in *Jackson* left an am-
biguity as to whether the gravamen of the holding was the
overwhelmingly intimidating effect of a possible death penalty
on the defendant's decision to contest his guilt or, rather, the
unacceptability of any scheme which made the tender of a plea
of guilt a more attractive prospect in terms of potential pun-

ishment than taking the chance of an adverse verdict at a trial. A number of allusions in the opinion to the gravity of the defendant's dilemma support the first view: "* * * the defendant's assertion of the right to jury trial may cost him his life * * *", 390 *U. S.* at 572, 88 *S. Ct.* at 1211; "Under the Federal Kidnapping Act * * * the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die. One problem is to decide whether the Constitution *permits the establishment of such a death penalty,* applicable only to those defendants who assert their right to contest their guilt before a jury." *Id.* at 581, 88 *S. Ct.* at 1216 (emphasis added).

On the other hand, seeming to support the necessity of exact equivalence of potential punishment under either a plea or a contest, was the Court's insistence that the evil it perceived was not that the federal statute necessarily "coerced" guilty pleas but that it "needlessly *encourage[d]*" them. 390 *U. S.* at 583, 88 *S. Ct.* 1209 (emphasis in the original). Thus, in responding to the Government's contention that the jury option for life imprisonment rather than death was a laudable statutory effort "to mitigate the severity of punishment", the Court said that objective could not be pursued by "penalizing those defendants who plead not guilty and demand jury trial". *Id.* at 582, 88 *S. Ct.* at 1217. It pointed out that the permissible objective had been constitutionally achieved in Washington and California by statutes which left the choice between life imprisonment and capital punishment to a jury in every case, regardless of how defendant's guilt had been determined. *Ibid.*

The issue for present purposes then boils down to the question whether there is a "needless" encouragement of guilty pleas in a statutory disparity between either maximum or minimum punishment on conviction and on a guilty plea when the death penalty is not involved. Dis-

senting in *State v. Forcella, supra,* Justices Jacobs and Hall clearly foresaw the issue we now face and answered the posed question in the negative. They concluded that the only repair of our statute required by *Jackson* was the substitution of life imprisonment for the death penalty. They disagreed with the majority, whose view it was, as expressed by Chief Justice Weintraub, that if our statute was vulnerable under *Jackson,* the indicated cure was to abolish the plea of *non vult* rather than the death penalty. 52 *N. J.* at 282, 283. Responding to the suggestion in the opinion of the majority that even if the death penalty were eliminated from the statute, it would still "involve a *Jackson*-type difficulty in that one who stood trial would receive a life sentence for first-degree murder while a defendant whose *non vult* plea was accepted could receive a sentence for a term of years" (52 *N. J.* at 282), the dissenters said (*Id.* at 300–301):

> The majority suggests that striking of the death penalty might still leave a "*Jackson*-type difficulty" in that a defendant who pleads *non vult* would receive life or a term of years whereas a defendant found guilty by a jury of first degree murder would necessarily receive life. But the jury might return a lesser verdict and, in any event, the inducement here would be insignificant when compared to the death penalty stricken in *Jackson.* The law has always been administered with pragmatic recognition of the fact that the difference between the death penalty and imprisonment entails more than matters of logic and degree. See *State v. Laws, supra,* 51 *N. J.* 494; *cf. Meszaros v. Gransamer,* 23 *N. J.* 179, 188 (1957); *State v. Wolf,* 46 *N. J.* 301, 308 (1966). *Jackson* was concerned solely with the grisly choice between a plea or waiver with an assurance of no death penalty, and a jury trial with the danger of a death penalty; it was not at all concerned with and did not mention the lesser inducements incident to the ordinary, though nonetheless troublesome, 'plea bargaining.' See Arnold, *Law Enforcement — An Attempt at Social Dissection,* 62 Yale L. J. 1 (1932); Note, *Guilty Plea Bargaining,* 112 *U. Pa. L. Rev.* 865, 878 (1964).

The soundness of the foregoing analysis of the parameters of *Jackson* has been fortified by subsequent decisions of the United States Supreme Court. In the first place, when *Forcella* came to be reviewed by the Supreme Court, it sum-

marily struck the death sentences of the several petitioners. *Funicello II, supra.* Significantly, the Court did not suggest that our statute also required revision to eliminate the disparity between potential penalties on a plea of guilty and after a trial. And when our Court thereafter recast the statute in *Funicello* III, *supra,* the Supreme Court denied review. *New Jersey v. Presha, supra* 408 *U. S.* 942, 92 *S. Ct.* 2849, 33 *L. Ed.* 2d 766.

Revealing light as to why the United States Supreme Court refused to disturb our statutory scheme beyond striking the death penalty is afforded by two of the opinions in the *Brady* trilogy of the Court announced May 4, 1970 (a date between the decision in *Jackson,* and the Court's ruling in *Funicello* II, *supra*). *Brady v. United States,* 397 *U. S.* 742, 90 *S. Ct.* 1463, 25 *L. Ed.* 2d 747; *McMann v. Richardson,* 397 *U. S.* 759, 90 *S. Ct.* 1441, 25 *L. Ed.* 2d 763; *Parker v. North Carolina,* 397 *U. S.* 790. 90 *S. Ct.* 1458, 25 *L. Ed.* 2d 785.

*Brady* involved an attempt by a federal prisoner to be relieved of a plea of guilty under the same kidnapping statute as was involved in *Jackson.* He had faced the prospect of a possible death penalty if tried and convicted, and he urged that his plea of guilty was coerced by the same considerations which had led the Court in *Jackson* to declare the death penalty unconstitutional. The Court stated that the petitioner had "read far too much into the *Jackson* opinion." 397 *U. S.* at 746, 90 *S. Ct.* at 1468. It said that while *Jackson* prohibited the imposition of the death penalty under the kidnapping act it had not fashioned a new standard for judging the validity of guilty pleas nor mandated a new application of the previous test that guilty pleas are valid if both voluntary and intelligent. *Id.* at 747, 90 *S. Ct.* 1463, 25 *L. Ed.* 2d 747. The coercive effect of the statute recognized in *Jackson* did not render the actual plea in *Brady* involuntary where it was tendered on advice of counsel and with the consciousness of the strength of the Gov-

ernment's case against the defendant. *Id.* at 749–750, 90 *S. Ct.* 1463, 25 *L. Ed.* 2d 747.

What is of especial significance here is the Court's obvious equation in *Brady* of the trial-plea differential in potential punishment under the federal statute with precisely similar situations in plea negotiations and agreements as generally practiced and generally approved in this country.[5]

The Court stated (397 *U. S.* at 751, 90 *S. Ct.* at 1470):

Insofar as the voluntariness of his plea is concerned, there is little to differentiate Brady from (1) the defendant, in a jurisdiction where the judge and jury have the same range of sentencing power, who pleads guilty because his lawyer advises him that the judge will very probably be more lenient than the jury; (2) the defendant, in a jurisdiction where the judge alone has sentencing power, who is advised by counsel that the judge is normally more lenient with defendants who plead guilty than with those who go to trial; (3) the defendant who is permitted by prosecutor and judge to plead guilty to a lesser offense included in the offense charged; and (4) the defendant who pleads guilty to certain counts with the understanding that other charges will be dropped. In each of these situations, as in Brady's case, *the defendant might never plead guilty absent the possibility or certainty that the plea will result in a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty.* We decline to hold, however, that a guilty plea is compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged.

(emphasis added).

It is quite obvious that if defendant's present contention that the range of punishment, maximum and minimum, must constitutionally be the same on a conviction of crime after trial and upon tender and acceptance of a plea of guilty or *non vult*, a factor essential to successful plea negotiation

---

[5] See *Santobello v. New York*, 404 *U. S.* 257, 262, 92 *S. Ct.* 495, 30 *L. Ed.* 2d 427 (1971); *State v. Gibson*, 68 *N. J.* 499 (1975); *State v. Thomas*, 61 *N. J.* 314, 322 (1972); *State v. Taylor*, 49 *N. J.* 440, 445 (1967).

is practically precluded from operation, *i. e.,* "the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged". *Brady, supra,* 397 *U. S.* at 751, 90 *S. Ct.* at 1470. Defendant's present argument would forbid a sentencing scheme which even renders *possible* a lesser punishment on a plea of guilt than on a conviction after trial. The damage to legitimate criminal-justice-administration considerations inherent in defendant's position is clear from the *Brady* Court's demonstration of the desirability of productive plea negotiations. It said (397 *U. S.* at 751–752, 90 *S. Ct.* at 1471):

> The issue we deal with is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and *because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law.* For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious — his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages — the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury.     (emphasis added).

The Court concluded that acceptance of the defendant's position (397 *U. S.* at 753, 90 *S. Ct.* at 1471):

> * * * would require the States and Federal Government to forbid guilty pleas altogether, to provide a single invariable penalty for each crime defined by the statutes, or to place the sentencing func-

tion in a separate authority having no knowledge of the manner in which the conviction in each case was obtained.[6]

In the same year that *Brady* was decided, the Supreme Court rendered its opinion in *North Carolina v. Alford,* 400 *U. S.* 25, 91 *S. Ct.* 160, 27 *L. Ed.* 2d 162 (1970). In holding that a defendant (who entered a plea of guilty to second degree murder under a North Carolina murder statute with a death penalty provision for first degree murder similar to the federal kidnapping statute involved in *Jackson*) was not entitled to withdraw his guilty plea, even where at the time he gave the plea he said he was not guilty, the Court reiterated that it was not unconstitutional for a state to adopt a procedure under which a defendant would receive a lesser penalty in exchange for a guilty plea. It said (400 *U. S.* at 38–39, 91 *S. Ct.* at 168):

> Relying on *United States v. Jackson, supra,* Alford now argues in effect that the State should not have allowed him this choice but should have insisted on proving him guilty of murder in the first degree. The States in their wisdom may take this course by statute or otherwise and may prohibit the practice of accepting pleas to lesser included offenses under any circumstances. But this is not the mandate of the Fourteenth Amendment and the Bill of Rights. The prohibitions against involuntary or unintelligent pleas should not be relaxed, but neither should an exercise in arid logic render those constitutional guarantees counter-productive and put in jeopardy the very human values they were meant to preserve.[7]

---

[6]A holding of the Supreme Court parallel to that in *Brady* was rendered in the third of the trilogy of cases cited, *Parker v. North Carolina, supra* 397 *U. S.* 790, 90 *S. Ct.* 1458, 25 *L. Ed.* 2d 785. The petitioner there had been indicted for first-degree burglary under a state statute which provided for the death penalty for that offense unless the jury recommended life imprisonment. If a plea of guilty was accepted the punishment would be life imprisonment. The defendant pleaded guilty and was sentenced to life imprisonment. He thereafter sought an invalidation of the plea partly on *Jackson* grounds. The court rejected the argument on the rationale of *Brady.*

[7]The significance of *Brady, Parker* and *Alford* in reducing the threat of an expansive view of *Jackson* to the whole concept of plea

The foregoing discussion serves not only to caution against an excessively broad reading of *Jackson* because of the threat to legitimate plea negotiations, but it also demonstrates compliance of the present sentencing scheme with the *Jackson* monition that encouragement of defendants not to contest their guilt not be "needless" or "unnecessary". 390 *U. S.* at *582, 583, 88 S. Ct. 1209.* It has been amply demonstrated above that encouragement of guilty defendants not to contest their guilt is at the very heart of an effective plea negotiation program. While one can never be certain that all defendants so encouraged are in fact guilty, our practice on acceptance of guilty or *non vult* pleas requires that the judge satisfy himself by inquiry of the defendant and others that there is a factual basis for the plea. *R.* 3:9–2; *State v. Reali,* 26 *N. J.* 222 (1958). As well stated by the Chief Justice in *State v. Forcella, supra,* "[w]e should not deny a justified leniency for the many, merely to be positive that no man is needlessly encouraged not to defend." 52 *N. J.* at 276. The substantial benefits to the State as well as to the generality of criminal defendants, well summarized by the Supreme Court in the excerpt from *Brady,* quoted above, constitute a "need" for the encouragement of pleas of guilty within the requirement for such need laid down by *Jackson* (assuming that case survives as authority in respect of situations other than those involving the death penalty, which we strongly doubt[8]).

negotiations is highlighted by the literature in relation to *Jackson* published before the decisions in *Brady* and the other cited cases. See, *e. g.,* Comment, 54 *Cornell L. Rev.* 448 (1969) ; Poe, "Capital Punishment Statutes In The Wake of United States v. Jackson: Some Unresolved Questions," 37 *Geo. Wash. L. Rev.* 719 (1969) ; "The Supreme Court, 1967 Term," 82 *Harv. L. Rev.* 63, 156 (1968) ; Comment, 44 *N. Y. U. L. Rev.* 612 (1969) ; Comment 47 *N. C. L. Rev.* 421 (1969) ; Note, "Discriminatory Sentencing and the Unitary Trial: Two Areas for Application of the United States v. Jackson Rationale," 31 *U. Pitt. L. Rev.* 118 (1969) ; Comment, 1969 *Wash. U. L. Q.* 231 (1969) ; Comment, 22 *Rutgers L. Rev.* 167 (1967).

[8]There is a clear implication in *Jackson* that once the death penalty was eliminated, a viable plea negotiation potential in the recast

Nothing said hereinabove loses force by virtue of the fact that in the sentencing scheme before us a life sentence is mandatory upon a conviction of first degree murder. The present litigation is not a seminar on the pros and cons of mandatory sentencing, and our decision here implies no view of sound penological policy in the matter.[9] From the constitutional standpoint we are considering, *i. e.,* the extent of permissible encouragement of guilty pleas, there can be no objection to mandatory sentencing for prescribed offenses on conviction after trial, this being a policy matter completely within legislative discretion. *State v. Hampton,* 61 *N. J.* 250, 273 (1972); *People v. Broadie,* 37 *N. Y.* 2d 100, 371 *N. Y. S.* 2d 471, 481, 332 *N. E.* 2d 338, 345 (Ct. App. 1975); *Commonwealth v. Jackson,* 344 *N. E.* 2d 166, 170 (Sup. Jud. Ct. Mass. 1976); *State ex rel. Moraites v. Gorman,* 322 *N. E.* 2d 319, 320–321 (Ct. App. Ohio 1974). So much granted, the ultimate inquiry devolves to whether the juxtaposition of a potential lesser sentence on a plea of *non vult* alongside the unexceptionable mandatory life sentence on a conviction condemns the statutory scheme as a needless encouragement of the surrender of the right to defend and therefore an impermissible impingement on defendants' Fifth Amendment rights. The considerations discussed above strongly argue to the contrary.

The risks attendant upon the choice a murder defendant must make under our murder statute as to whether to defend or plead guilty are comparable to those arising from many other kinds of decisions a criminal defendant must

---

statute was thought desirable. Responding to a Government suggestion that the federal act could be sustained by judicial elimination of all guilty pleas and waivers, the Court noted that this would require full-dress jury trials in all cases, and, "apart from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt," would "rob the criminal process of much of its flexibility". 390 *U. S.* at 584, 88 *S. Ct.* at 1218.

[9] A "life sentence" is, for all practical purposes, a sentence for less than the natural life of the defendant.

make in the course of a prosecution. See *Chaffin v. Stynch-combe,* 412 *U. S.* 17, 93 *S. Ct.* 1977, 36 *L. Ed.* 2d 714 (1973) (more onerous verdict by a jury on a retrial after successful appeal from original conviction); *Crampton v. Ohio,* reported *sub nom. McGautha v. California,* 402 *U. S.* 183, 91 *S. Ct.* 1454, 28 *L. Ed.* 2d 711 (1971) (dilemma of murder defendant as to whether to testify in single-trial procedure for assessment both of guilt and punishment); *Colten v. Kentucky,* 407 *U. S.* 104, 92 *S. Ct.* 1953, 32 *L. Ed.* 2d 584 (1972) (retrial *de novo* on appeal from inferior court with potential of greater punishment); *Brady v. United States, supra; McMann v. Richardson, supra* 397 *U. S.* 759, 90 *S. Ct.* 1441, 25 *L. Ed.* 2d 763 (choice between challenging coerced confession at trial and pleading guilty to assure lighter sentence). "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow". *McGautha v. California, supra* 402 *U. S.* at 213, 91 *S. Ct.* at 1470. The defendant in a criminal trial "is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction." *Williams v. Florida,* 399 *U. S.* 78, 83, 90 *S. Ct.* 1893, 1897, 26 *L. Ed.* 2d 446 (1970). If he testifies, he exposes himself to confrontation with prior criminal convictions. So too, when an accused presents witnesses at trial, he must reveal their identity and submit them to cross-examination, which, in itself, may prove incriminating or which may furnish the prosecution with strong rebuttal evidence. *Id.* at 83–84, 90 *S. Ct.* 1893. That the defendant faces such a dilemma "has never been thought an invasion" of his constitutional rights. *Id.* at 84, 90 *S. Ct.* 1897. In all of such situations, as in many similar ones, the question is whether the inherent compulsion of the defendant to make a choice impairs any constitutional right. *McGautha v. California, supra* 402 *U. S.* 213, 91 *S. Ct.* 1454. Unless the courts exercise considerable self-restraint in judging the validity of such constraints upon criminal defendants in our necessarily highly pragmatic

criminal justice system, its effective operation could be intolerably prejudiced.

Finally, it is our considered view that *Jackson* today is authority only for a situation where a defendant faces the prospect of a possible death sentence if convicted as against the alternative of merely a prison term if he pleads guilty. We have hereinabove stressed the language of *Jackson* emphasizing the awful pressure exerted upon a defendant whose choice of a course of action may mean his death. At the time of *Jackson*, the Court was undoubtedly already sensitive to the considerations which were to lead to the later broad invalidation of death penalties in *Furman v. Georgia*, 408 *U.S.* 238, 92 *S. Ct.* 2726, 33 *L. Ed.* 2d 346 (1972). *Cf. Witherspoon v. Illinois, supra* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776.

As noted by the dissenting Justices in *State v. Forcella, supra, "Jackson* was concerned solely with the grisly choice between a plea or waiver with an assurance of no death penalty, and a jury trial with the danger of a death penalty". 52 *N. J.* at 301. They further pointed out that "the law has always been administered with pragmatic recognition of the fact that the differences between the death penalty and imprisonment entails more than matters of logic and degree". *Id.* at 300–301. In *Furman v. Georgia* it was stated by Justice Brennan, concurring, that "[t]he calculated killing of a human being by the State involves by its very nature, a denial of the executed person's humanity". 408 *U. S.* at 290, 92 *S. Ct.* at 2752. "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two". *Woodson v. North Carolina,* 428 *U. S.* 280, 305, 96 *S. Ct.* 2978, 2992, 49 *L. Ed.* 2d 944, 961 (1976).

We believe enough has been said to demonstrate that the same Court which decided both *Jackson* and *Brady* would not strike down as infringing upon Fifth Amendment rights a sentencing scheme providing for a disparity between a potential penalty upon a conviction and that upon a plea of

guilty where the former was imprisonment rather than the death penalty.

In summary of the foregoing, we conclude: (1) the authority of *Jackson* is confined to the case of a choice between trial and plea of guilt when a possible consequence of the former, and only of the former, is the death penalty; (2) alternatively, if the authority of *Jackson* goes beyond situation (1), any encouragement or inducement of a defendant to plead *non vult* under our statute and thereby waive his right to trial is not the result of a needless or unnecessary procedural device but a highly useful and desirable one, and the encouragement is therefore not an impermissible infringement of defendant's Fifth Amendment rights.

## II

### *Alleged Denial of Equal Protection*

Defendant contends that the sentencing scheme of *N. J. S. A.* 2A:113-3, 4 has the effect of separating persons who have committed felony murder into two classes — those who go to trial and those who plead *non vult* — and of treating the former class differently and discriminatorily as to punishment without a compelling state justification for the difference in treatment. This is urged to constitute an unconstitutional denial of equal protection of the laws.

The State first counters with two preliminary responses: (1) that those indictees who plead *non vult* are pleading to a different "crime" from that of which one is convicted where, after trial, the jury returns a verdict of first-degree murder; (2) that the statute does not create differently treated classes, but, rather, merely offers all such indictees a choice, and that it is the defendant who places himself in one "class" or the other based upon his choice. We regard the second response as more semantic than substantive, and pass it. The first response is that in legal contemplation the crime identified by a conviction of first degree murder is different from the undifferentiated crime of murder, as stated

in the formal indictment, which will support convictions of first or second degree murder or manslaughter. See *State v. Sullivan,* 43 *N. J.* 209, 241–247 (1964). Therefore, goes the argument, acceptance of a *non vult* plea constitutes conviction of a different crime from first degree murder and may be treated differently.

We do not accept the latter position as a fully satisfactory basis for meeting the defendant's argument, which, it seems to us, can and should be dealt with more directly. We therefore pass to the State's defense of the statute on grounds more related to the merits of the equal protection .attack.

In the first place, we concur in the State's rejection of defendant's contention that the issue calls for application of the more exacting of the two tests for deciding an equal protection question — that of requiring the demonstration of a "compelling state interest" for the classification, as where "suspect" categories or "fundamental" rights are involved. See *Dunn v. Blumstein,* 405 *U. S.* 330, 342, 92 *S. Ct.* 995, 31 *L. Ed.* 2d 274 (1972); *Shapiro v. Thompson,* 394 *U. S.* 618, 634, 89 *S. Ct.* 1322, 22 *L. Ed.* 2d 600 (1969); *State v. Chambers,* 63 *N. J.* 287, 296 (1973); *State v. Costello,* 59 *N. J.* 334, 345–346 (1971) (both of the latter cases involving penological classification based on the suspect category of sex). In this State, however, where the Legislature has created classifications of offenders for purposes of fixing penalty, the courts have continued (absent use of suspect criteria such as race or sex) to apply the traditional "rational relationship" test. *State v. Fearick,* 69 *N. J.* 32, 38 (1976); *State v. Smith,* 58 *N. J.* 202, 206–207 (1971). *State in Interest of K.V.N.,* 116 *N. J. Super.* 580, 589 (App. Div. 1971), aff'd o. b. 60 *N. J.* 517 (1972). These cases stand for the proposition that in the area of classification of criminal or penal offenders for purposes of penalty or punishment the Legislature may provide for differences of treatment so long as there is some rational connection between the classification and a proper legislative purpose.

If, therefore, defendant is right in asserting that murder indictees who contest guilt by trial and are convicted of first degree murder and those whose *non vult* pleas are accepted by the court are constituted separate classes by the statute, the question as to whether that classification, in the light of the different minimum punishments prescribed for each class is valid, becomes an inquiry as to whether there is a proper legislative purpose to which the classification is rationally related. This inquiry, we are clear, must be resolved in the affirmative. There are several such purposes. The first is the humane and rehabilitative one of ameliorating the rigor of life imprisonment for those offenders who are willing to acknowledge their crime. *State v. Poteet,* 61 *N. J.* 493, 496 (1972); *State v. Forcella, supra* (52 *N. J.* at 275, 299–300). Other such purposes are fully developed in Part I of this opinion where they are cited to demonstrate that any encouragement in our statutory scheme to murder indictees to plead *non vult* is "needed" and not "unnecessary", within Fifth Amendment criteria and considerations. These purposes include the facilitation of plea negotiations in homicide cases, necessary to achieve flexibility and efficiency as well as justice in criminal justice administration; the conservation of scarce judicial and prosecutorial resources for those cases which properly require trial; and the prompter imposition of punishment on acknowledged offenders. See *Brady v. United States, supra* 397 *U. S.* at 752, 90 *S. Ct.* 1463.

All of the foregoing presumptive legislative purposes are, to say the least, rationally connected with the difference in potential minimum penalties respectively imposable upon conviction of first degree murder and upon acceptance by the court of a *non vult* plea to a charge of murder.[10] That such purposes, arguably, could be served more wisely were there a more flexible range of punishments on conviction for first

---

[10]It might well be argued that such purposes even amount to a "compelling state need", were it legally necessary to meet that equal protection test.

degree murder than the life imprisonment now mandated is irrelevant, for equal protection purposes. The Legislature is not required to formulate the plan that seems most rational or sound to the court. It is sufficient if *any* rational basis relevant to a proper purpose underlies the classification and the attendant treatment of the classes affected. *State v. Smith,* 58 *N. J.* 202, 206–207 (1971); *State v. DeStasio,* 49 *N. J.* 247, 260 (1967), *cert.* den. 389 *U. S.* 830, 88 *S. Ct.* 96, 19 *L. Ed.* 2d 89 (1967); *State v. Wingler,* 25 *N. J.* 161, 175–176 (1957).

We conclude the equal protection attack upon the statutory scheme is without merit.

Judgment affirmed.

SULLIVAN, J. (dissenting). I find myself unable to agree with the reasoning and conclusion in the majority opinion. Plainly stated, the statutory sentencing scheme before us provides that if a defendant who is indicted for murder exercises his right to stand trial by jury and is convicted of murder in the first degree he must receive a sentence of life imprisonment. However, if he pleads *non vult* to the same indictment, he becomes eligible to receive a sentence for any term of years not exceeding 30 years and even have such sentence suspended. *N. J. S. A.* 2A:168–1.

The majority opinion states that the issue is whether this scheme results in the "needless encouragement" of guilty pleas. It is that in part, but of equal importance, here it penalized a defendant who exercised his right to stand trial. For that he had a mandatory sentence of life imprisonment imposed on him. I agree with the late Chief Justice Weintraub that such a sentencing scheme would and does present "a *Jackson*-type difficulty[1] in that one who stood trial would receive a life sentence for first-degree murder while a defendant whose *non vult* plea was accepted could receive

---

[1] *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138 (1968).

a sentence for a term of years." *State v. Forcella,* 52 *N. J.* 263, 282 (1968).

. Various alternatives would be constitutionally permissible. One would be to abolish the *non vult* plea to the indictment and instead provide that a defendant would not be permitted to plead guilty to murder in the first degree but only to second degree murder. Also, the mandatory sentence of life imprisonment for first degree murder could be changed so as to vest discretion in the sentencing judge. This latter solution would appear to be the more desirable because mandatory sentences, while they have been held to pass constitutional muster, bar a sentencing judge from taking into account facts and circumstances which otherwise might properly be relevant in fixing sentence.

. The majority opinion holds that the separate classification for sentencing purposes of those who plead *non vult* to murder and those who choose to stand trial has a rational purpose akin to our system of plea negotiations. I see a substantial difference. Plea negotiations as noted in the majority opinion legitimately take into account a guilty defendant's willingness to admit such guilt and thereby conserve judicial and prosecutorial resources. A sentencing judge, in his discretion, may take such a plea of guilt into consideration in fixing the degree of punishment. However, a sentencing scheme which presents the threat of penalizing a defendant because he pleads not guilty and demands a jury trial, is not the same thing.

I am concerned about a defendant who pleads *non vult* to an indictment for murder in order to avoid the risk of a mandatory life sentence if he stands trial. I am equally concerned about a defendant who exercises his constitutional right to stand trial on the same indictment and because he does so, as here, now faces a mandatory life sentence. To me, in addition to presenting a *Jackson*-type difficulty, this involves a denial of equal protection of the laws.

I would invalidate the mandatory life sentence provision of the statute, vacate the life sentence imposed on de-

fendant and remand the matter to the trial court for resentencing with the trial judge to exercise such discretion as the circumstances warrant.

PASHMAN, J., dissenting. The majority today holds that a defendant may be denied the opportunity to receive a reduced sentence *solely* because he exercised his constitutional right to have his guilt determined by a jury of his peers. It now holds that a person who stands trial and is convicted will receive a mandatory life sentence even though that same individual might have been eligible for a suspended sentence if he had admitted his guilt and waived his rights. I believe that this decision calls into question some of our most basic constitutional guarantees, including a person's right to a jury trial, *Duncan v. Louisiana,* 391 *U. S.* 145, 88 *S. Ct.* 1444, 20 *L. Ed.* 2d 491 (1968), to confront one's accusers, *Pointer v. Texas,* 380 *U. S.* 400, 85 *S. Ct.* 1065, 13 *L. Ed.* 2d 923 (1965), to present witnesses in one's defense, *Washington v. Texas,* 388 *U. S.* 14, 87 *S. Ct.* 1920, 18 *L. Ed.* 2d 1019 (1967), to remain silent, *Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653 (1964), and to be convicted by proof beyond a reasonable doubt, *In re Winship,* 397 *U. S.* 358, 90 *S. Ct.* 1068, 25 *L. Ed.* 2d 368 (1970). The price tag which today's decision places on the exercise of such rights stands in stark contrast to the protections which they have traditionally enjoyed. Accordingly, I respectfully dissent.

## I

### A

The statutory scheme which gives rise to today's decision makes sentencing of persons charged with murder depend upon whether or not they exercise their constitutional right to go to trial. The sentencing procedure provides that if a defendant who is indicted for murder exercises his right to go to trial and is convicted of murder in the first degree,

he *must* receive life imprisonment. If he pleads *non vult* to the same indictment, he *may* receive a suspended sentence or any term not exceeding 30 years. *State v. Funicello,* 60 *N. J.* 60, 68. (1972).

This unfair result contradicts the numerous cases holding that the sentence imposed on a criminal defendant may not depend upon whether he has exercised his right to trial. *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138 (1968); *Pope v. United States,* 392 *U. S.* 651, 88 *S. Ct.* 2145, 20 *L. Ed.* 2d 1317 (1968); *United States v. Derrick,* 519 *F.* 2d 1, 3 (6 Cir. 1975) ("it is improper for a district judge to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt"); *Voyles v. Thorneycroft,* 398 *F. Supp.* 706 (D. Ariz. 1975); *People v. Young,* 20 *Ill. App.* 3d 891, 314 *N. E.* 2d 280 (1974). In *Hess v. United States,* 496 *F.* 2d 936 (8 Cir. 1974), the Eighth Circuit noted that it was joining "a host of other courts in recognizing that whether a defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed," 496 *F.* 2d at 938, citing in support of this proposition: *United States v. Marzette,* 485 *F.* 2d 207 (8 Cir. 1973); *United States v. Stockwell,* 472 *F.* 2d 1186 (9 Cir.), *cert.* den. 411 *U. S.* 948, 93 *S. Ct.* 1924, 36 *L. Ed.* 2d 409 (1973); *United States v. Hopkins,* 150 *U. S. App. D. C.* 307, 464 *F.* 2d 816, 822 (1972); *Scott v. United States,* 135 *U. S. App. D. C.* 377, 419 *F.* 2d 264, 269–74 (1969); *Baker v. United States,* 412 *F.* 2d 1069, 1073 (5 Cir. 1969), *cert.* den. 396 *U. S.* 1018, 90 *S. Ct.* 583, 24 *L. Ed.* 2d 509 (1970); *United States v. Wiley,* 278 *F.* 2d 500, 504 (7 Cir. 1960).[1]

---

[1]This principle is not foreign to our own Court. The statement was made in *State v. De Stasio,* 49 *N. J.* 247, 259 (1967), *cert.* den. 389 *U. S.* 830, 88 *S. Ct.* 96, 19 *L. Ed.* 2d 89 (1967), that "a sentence may not be increased because a defendant defended against

In *United States v. Jackson, supra,* the United States Supreme Court considered a sentencing scheme similar to the instant one, although admittedly under it the potential consequences of asserting one's right to trial were substantially more severe. The challenged statute, 18 *U. S. C.* § 1201(a), permitted a defendant to be sentenced to the death penalty only upon a jury recommendation of that sanction. Thus, the death penalty could only be imposed where the defendant pleaded not guilty and unsuccessfully exercised his right to a trial. In holding the statute unconstitutional, the Court clearly indicated that *any* statute which operates to chill the exercise of a defendant's constitutional rights must be invalidated. Mr. Justice Stewart wrote for the Court:

> Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert the right to contest their guilt before a jury. The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. *If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional.*
> [390 *U. S.* at 581, 88 *S. Ct.* at 1216, 20 *L. Ed.* 2d at 147; footnote omitted; emphasis added]

Contrary to the notion of today's majority, the Supreme Court's decision was not grounded on the theory that a defendant's rights were "chilled" only in a situation where a conviction by a jury resulted in the mandatory imposition of a more severe penalty than that which could have been imposed upon a plea. The statute involved in *Jackson,* as well as those in *Pope v. United States, supra,* and *Funicello v. New Jersey,* 403 *U. S.* 948, 91 *S. Ct.* 2278, 29 *L. Ed.*

the charge. . . ." It was also repeated approvingly in *State v. Gibson,* 68 *N. J.* 499, 510 (1975) and *State v. Poteet,* 61 *N. J.* 493, 496 (1972), *habeas corpus* granted *sub nom. Poteet v. Fauver,* 517 *F.* 2d 393 (3 Cir. 1975).

2d 859 (1971), made it possible for a defendant who had been convicted by a jury to receive precisely the same lesser sentence which could have been imposed had he pleaded *guilty*. Unlike the situation presented in this case with respect to life imprisonment, the death penalty was not the mandatory sentence upon such conviction. Rather, it is obvious that the Court felt that the *mere possibility* of a more severe sentence resulting from a jury trial chilled a defendant's exercise of his constitutional rights.

## B

The majority, however, argues that the Court's opinion in *Jackson* is distinguishable for two reasons: (1) the possibility of the death sentence in that case was far more coercive than the threat of life imprisonment involved here, and (2) there the defendant could have received a more severe sentence by going to trial while here he is merely eligible to receive a less severe sentence if he pleads *non vult*. See *ante* at 389–391. Despite the acknowledgement that express language in *Jackson* seems to contradict either attempt at distinguishing the present scheme, the majority apparently embraces the first rationale as a means of circumventing the *Jackson* result. *Id.* at 391, quoting with approval, *State v. Forcella*, 52 *N. J.* 263, 300–01 (1968) (Jacobs, Hall, J.J., dissenting). See also *ante* at 399.

This emphasis on the fact that *Jackson* involved a sentencing scheme utilizing the death penalty is the basis of the majority's untenable assertion that a statute must actually *coerce* a defendant into pleading guilty in order to be constitutionally defective.

Yet as the majority itself recognizes, see *ante* at 390, the Court's opinion in *Jackson* specifically noted that such coercion was not a necessary element of an impermissible chilling of a defendant's exercise of his constitutional rights. The court reasoned that

the evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them.

A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right. Thus the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily.

> [390 *U. S.* at 583, 88 *S. Ct.* at 1217, 20 *L. Ed.* 2d at 148; emphasis in original]

Elsewhere in the opinion the Court stated that "Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right." 390 *U. S.* at 583, 88 *S. Ct.* at 1217, 20 *L. Ed.* 2d at 147.

Additional light is shed on the Court's meaning in using the phrases "needlessly encourages" or "penalizes the assertion of a constitutional right" by reference to *Griffin v. California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed.* 2d 106 (1965). The Court there held that allowing critical comment at trial concerning the accused's failure to take the stand in his own defense violated the Fifth Amendment privilege against self-incrimination. In language similar to that used in *Jackson,* the Court ruled that such conduct amounted to "a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." 380 *U. S.* at 614, 85 *S. Ct.* at 1232, 14 *L. Ed.* 2d at 109–10.

Hence, it is incontrovertible that *Jackson* and *Griffin* prohibit *any* governmental action which "needlessly encourages" a defendant's waiver of his constitutional rights or makes the assertion of those rights more "costly." *Griffin* precludes any argument that such an illegal "encouragement" comes only from the threat of the death penalty,[2] or that the

---

[2] In *United States v. McCoy,* 139 *U. S. App. D. C.* 60, 429 *F.* 2d 739 (1970) the Court applied the *Jackson* principle to a penalty of life imprisonment. At sentencing, the trial judge had informed the defendant that "anyone else who was convicted by a jury before me of Armed Robbery would receive a life sentence." 139 *U. S. App. D. C.* at 64, 429 *F.* 2d at 743. Although reversing the conviction on

constitutional infirmity would be cured if the "penalty" for going to trial could also be imposed upon a plea of *non vult*.[3].

Nor are *Jackson* and *Griffin* aberrations. They are wholly consistent with a line of authority holding that government may not unduly burden the exercise of constitutional rights. This same rationale was expressed by the Court in *Malloy v. Hogan, supra,* the seminal decision holding that the Fifth Amendment privilege against self-incrimination was applicable to the States through the Fourteenth Amendment. Mr. Justice Brennan, speaking for the Court, concluded that the privilege secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 *U. S.* at 8, 84 *S. Ct.* at 1493, 12 *L. Ed.* 2d at 659. The Court's opinion reinforces the theme enunciated in *Jackson* — that any needless encouragement to waive one's constitutional rights is tantamount to unconstitutional penalty:

---

other grounds, the Court noted that despite the defendant's lack of awareness of this judicial policy when he elected to exercise his right to trial,

'[the] inevitable effect of any such provision is * * * to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial.' *United States v. Jackson*, 390 *U. S.* 570, 581, 88 *S. Ct.* 1209, 1216, 20 *L. Ed.* 2d 138 (1968) (footnote omitted.)
[*Id.* at 743]

[3]The majority concludes that *Jackson* emphasized the fact that the only way to avoid the "penalty" was by waiving one's right to go to trial. See *ante* at 388. Thus, it would hold that since a defendant may receive a life sentence under the present scheme, whether or not he goes to trial, there is no constitutional impediment. However, this reasoning substitutes for the Supreme Court's clear-cut test — whether or not the scheme "needlessly encourages" guilty pleas — a new hyper-technical distinction. As I have already stated, under several statutes which the Supreme Court struck down, a defendant could receive the same sentence whether or not he pleaded guilty. I see no reason to conclude that the instant statute is any less of an encouragement to plead *non vult* than any of those. *See United States v. McCoy, supra.*

Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." * * * In other words the person must not have been compelled to incriminate himself. We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed, *Haynes v. Washington*, 373 *U. S.* 503, 83 *S. Ct.* 1336, 10 *L. Ed.* 2d 513 [378 *U. S.* at 7, 84 *S. Ct.* at 1493, 12 *L. Ed.* 2d at 659; citations omitted]

Other decisions cited by the Court in *Malloy, supra,* support this same unswerving tradition of rigorously assuring that a person's waiver of his constitutional rights is not tainted by governmental misconduct. *But see Smith v. United States,* 348 *U. S.* 147, 150, 75 *S. Ct.* 194, 99 *L. Ed.* 192, 197 (1954); *Ziang Sung Wan v. United States,* 266 *U. S.* 1, 14, 45 *S. Ct.* 1, 69 *L. Ed.* 131, 148 (1924); *Hardy v. United States,* 186 *U. S.* 224, 229, 22 *S. Ct.* 889, 46 *L. Ed.* 1137, 1140 (1907); *Bram v. United States,* 168 *U. S.* 532, 542–43, 18 *S. Ct.* 183, 42 *L. Ed.* 568, 573 (1897).

## C

The only question then is whether the governmental action in the present case "needlessly encourages" a defendant to waive his constitutional rights or makes the assertion of those rights more "costly." Clearly, this question must be answered in the affirmative, particularly when the present statutory scheme is measured against the evil perceived in *Griffin* or *Haynes v. Washington, supra.* Surely the threat here — the heightened possibility of a sentence of life imprisonment after trial — would have a far greater effect on a defendant's decision to waive his rights than either the possibility that a prosecutor will comment adversely on an accused's failure to testify at trial, as in *Griffin,* or the refusal to allow a person to speak with his wife until he confessed, as in *Haynes.*

The present statute is quite similar to the situation addressed by the Court in *Scott v. United States, supra.* The trial judge had told the defendant there that "[i]f you had pleaded guilty to this offense, I might have been more lenient with you." On appeal, Judge Bazelon concluded that "[t]he stark import of this comment [was] that the defendant paid a price for demanding a trial." 135 *U. S. App. D. C.* at 382, 419 *F.* 2d at 269 [footnotes omitted]. After observing that the United States Supreme Court had held that the assertion of Fourth, Fifth and Sixth Amendment rights may not be made more costly by a differential sentencing policy which "exact[s] a price from those who insist upon a trial," he concluded that such an announced policy taints sentencing with impermissible considerations which make a defendant a "pawn sacrificed to induce other defendants to plead guilty." 135 *U. S. App. D. C.* at 383, 385, 419 *F.* 2d at 270, 272. *See also United States v. McCoy, supra* at 743.

The present statute burdens the exercise of a defendant's rights even more onerously. By formalizing in a statute the disparity between sentences for pleas of not guilty and *non vult,* the State heightens the possibility that a defendant will be induced to plead to a charge.

## D

I find little to persuade me of the merit of the majority's position in the three cases which it cites: *North Carolina v. Alford,* 400 *U. S.* 25, 91 *S. Ct.* 160, 27 *L. Ed.* 2d 162 (1970); *Brady v. United States,* 397 *U. S.* 742, 90 *S. Ct.* 1463, 25 *L. Ed.* 2d 747 (1970); *Parker v. North Carolina,* 397 *U. S.* 790, 90 *S. Ct.* 1458, 25 *L. Ed.* 2d 785 (1970). These cases addressed only the issue of permissible grounds for withdrawal of a guilty plea which was obtained under an unconstitutional scheme. They are of little help in determining whether a statutory scheme itself is constitutional.

Contrary to the majority's assumption, these cases do not represent an erosion of the *Jackson* principle. The basis

for the Supreme Court's opinions in the three cases was foreshadowed in *Jackson* when the Court stated that

the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily.

> [390 *U. S.* at 583, 88 *S. Ct.* at 1217, 20 *L. Ed.* 2d at 148; footnote omitted]

Thus, the Court was able to say in *Brady v. United States, supra,* that *Jackson*

neither fashioned a new standard for judging the validity of guilty pleas nor mandated a new application of the test theretofore fashioned by courts and since reiterated that guilty pleas are valid if both "voluntary" and "intelligent."

> [397 *U. S.* at 747, 90 *S. Ct.* at 1468, 25 *L. Ed.* 2d at 756]

In a footnote the Court added that "[t]he requirement that a plea of guilty must be intelligent and voluntary to be valid has long been recognized." *Id.,* n. 4. Hence, I do not regard these largely irrelevant cases as an endorsement of our current sentencing plan. They are solely concerned with the standard to be applied when a defendant seeks to withdraw a guilty plea. The Supreme Court has indicated that a more stringent burden applies in the latter situation than when attacking the constitutionality of a sentence. Such a result is in keeping with the extreme importance which the Court has consistently placed on the finality of a plea. *See McMann v. Richardson,* 397 *U. S.* 759, 774, 90 *S. Ct.* 1441, 1450, 25 *L. Ed.* 2d 763, 775 (1970)(decided the same day as *Brady* and *Parker v. North Carolina*)("interests in maintaining the finality of guilty plea convictions" warrant judging plea under law existing when plea given); *Tollett v. Henderson,* 411 *U. S.* 258, 93 *S. Ct.* 1602, 36 *L. Ed.* 2d 235 (1973)(guilty plea may not be withdrawn although given following an indictment by an unconstitutionally selected grand jury).

Notwithstanding the inapposition of these cases, the majority goes beyond the strict holdings in *North Carolina v. Alford, Brady* and *Parker v. North Carolina* and finds comfort in *dicta* in those cases referring to the propriety of plea negotiations or bargaining. Equating the present sentencing arrangement with other choices a defendant must make in the course of a trial, it concludes that the "needless encouragement" referred to in *Jackson* only applies to a situation in which the death penalty is involved. See *ante* at 397.

Contrary to the conclusion which the majority derives from the dicta in this trilogy of cases, I regard their language to be relevant only insofar as it confirms an otherwise obvious conclusion: that inducements which are implicit in the criminal justice system itself provide an insufficient basis for prohibiting guilty pleas in general. Thus, it would be frivolous for a defendant to attempt to withdraw a guilty plea because he was induced to admit his guilt by a desire to appease his conscience, or spare his family the anguish or expense of enduring a trial, or even to convince the sentencing judge that his admission of culpability was indicative of his capacity for being reformed. However, I regard the considerations which must inevitably weigh upon a defendant's mind under the present sentencing scheme as being fundamentally distinguishable. The heightened possibility of a life sentence exerts a more coercive pressure on a person's mind than any of the other "inducements" mentioned by the majority. Furthermore, it can in no way be considered necessarily incidental to our system of justice.

I consider plea bargaining to involve entirely distinguishable considerations. Although both the Court's interpretation of the present statute and a plea bargain involve an inducement in that a defendant can receive a lesser sentence, only the former contemplates imposing a penalty for failing to plead guilty. For instance, it is settled that the State could not induce a plea by threatening that the sentencing judge would decline to consider mitigating circumstances

if the defendant refuses to accept a bargain. *See generally Santobello v. New York,* 404 *U. S.* 257, 265–66, 92 *S. Ct.* 495, 30 *L. Ed.* 2d 427, 434–35 (Douglas, J., concurring) (1971); Scott v. *United States, supra,* 135 *U. S. App. D. C.* at 387, 419 *F.* 2d at 274 (court may not "create incentives for guilty pleas [in the bargaining process] by a policy of differential sentences"). Furthermore, where a person rejects a bargain, the State may not use that fact as a ground for preventing him from exercising the right to appeal his sentence on the ground that it was excessive. *Cf. State v. Gibson, supra.* Yet these are precisely the type of penalties which today's result mandates.[4]

Moreover, it is doubtful whether a court would ever accept a plea bargain under the circumstances created by this scheme. As Mr. Justice Mountain stated in *State v. Thomas,* 61 *N. J.* 314 (1972), "[i]f plea bargaining is to fulfill its intended purpose, it must be conducted fairly on both sides and the results must not disappoint the reasonable ex-

---

[4]One commentary has noted that

> courts appear to make the distinction that a defendant cannot be *forced* to *pay* for exercising a constitutionally granted right, yet he cannot be heard to complain if he voluntarily *receives* a concession for waiving the right. If the accused is exposed to a greater risk for asserting a right, then he is being encouraged not to exercise his legal and constitutional prerogatives and is possibly deprived of the ability to freely weigh the alternatives. Nevertheless, the decision to plead guilty to a lesser sentence and avoid the risk of either a conviction on more serious charges or a more severe sentence is held voluntary.
>
> > [Note, "The Legitimation of Plea Bargaining: Remedies for Broken Promises," 11 *The American Criminal Law Review* 771, 777 (1973); footnotes omitted; emphasis in original]

It then went on to apply this reasoning, concluding that this distinction explains the "contrasting judicial treatment of differential sentencing and plea bargaining. Differential sentencing is generally unacceptable: any announced judicial policy whereby a defendant who is convicted by trial will be sentenced more harshly than if he pleads guilty, is a denial of due process of law." *Id.*

pectations of either." 61 *N. J.* at 321. The necessary corollary of such a holding is that a bargain may be enforced only if the defendant is "fully aware of the direct consequences [of his plea], including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, . . ." *Brady v. United States, supra,* 397 *U. S.* at 756, 90 *S. Ct.* at 1472, 25 *L. Ed.* 2d at 760, quoting approvingly from *Shelton v. United States,* 246 *F.* 2d 571, 572, n. 2 (5 Cir. 1957) (*en banc*), rev'd on confession of error on other grounds, 356 *U. S.* 26, 78 *S. Ct.* 563, 2 *L. Ed.* 2d 579 (1958). *See also State v. Gibson, supra,* 68 *N. J.* at 518 (Schreiber, J., concurring). Under today's holding a defendant who pleads *non vult* to avoid running the risk of a conviction after trial is not only deprived of the benefit of a reduction in charges, but is told only that he will receive a sentence varying anywhere from probation to life imprisonment. While such a defendant knows that the sentencing judge is now in a position to consider mitigating factors, he cannot be assured of the result of his plea or even of the weight which will be accorded those factors. A defendant in this uncertain position cannot be said to be "fully aware of the direct consequences of his plea." In fact, contrary to the theory that the sentence in this case can be upheld on the basis of an analogy to plea bargaining, this state of affairs typifies the "pleading in the dark" which has led various courts to place stricter limits on the bargaining process.[5] *See* Gallagher, "Judicial Participation in Plea Bargaining: A Search for New Standards," 9 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 29, 33 (1974).

I believe that plea bargains serve certain legitimate functions which distinguish them from sentencing under the

---

[5]Any such holding would render ludicrous the corollary requirement that the terms of a bargain be carried out. *Santobello v. New York, supra; State v. Brown,* 71 *N. J.* 578 (1976) ; *State v. Jones,* 66 *N. J.* 524, 525–26 (1975).

scheme in question. Such negotiations allow a prosecutor to offer leniency in exchange for assistance or testimony which is necessary in other cases, *State v. Taylor,* 49 *N. J.* 440, 455 (1967), and enable him to fully carry out the charging function vested in his office. *Cf. State v. Leonardis,* 73 *N. J.* 360, 379, n. 9 (1977). On the other hand, the statute in question appears to have the single purpose of encouraging people to plead *non vult.* Such a purpose is impermissible under our Constitution, and I would thus hold that this scheme is unconstitutional. I believe that we are bound in this regard by the United States Supreme Court's mandate in *Jackson* that if a "provision [has] no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." 390 *U. S.* at 581, 88 *S. Ct.* at 1216, 20 *L. Ed.* 2d at 147.

## II

My conclusion that this scheme has only one purpose — to chill the assertion of an accused's constitutional rights — impels me to conclude that it is also violative of defendant's right to equal protection of the laws under the Fourteenth Amendment. Even if the majority is correct in assuming that a sentencing scheme which provides for disparate sentencing may be upheld merely upon a showing of its *rational* relationship to some legitimate state object,[6] I fail to see any legitimate state purpose served by this plan.

---

[6]Recently this Court held that a scheme which results in disparate sentencing is inherently suspect and must be supported by a compelling state interest. Mr. Justice Sullivan wrote for a unanimous Court in *State v. Chambers,* 63 *N. J.* 287 (1973):

Generally, legislative selection of a class for special treatment can be justified where there is some rational basis between the classification and the object sought to be achieved. However, certain classifications by their very nature are inherently suspect and will be subjected to close judicial scrutiny as to whether a fundamental constitutional right is being impaired. * * *

[63 *N. J.* at 295–96]

The requirement that any legislative enactment must serve some legitimate state objective has been stated throughout the opinions of this Court and the United States Supreme Court. *See, e. g., Dunn v. Blumstein,* 405 *U. S.* 330, 92 *S. Ct.* 995, 31 *L. Ed.* 2d 274 (1972); *Lindsey v. Normet,* 405 *U. S.* 56, 70, 92 *S. Ct.* 862, 31 *L. Ed.* 2d 36, 48 (1972); *State v. Fearick,* 69 *N. J.* 32, 38 (1976); *State v. Smith,* 58 *N. J.* 202, 207 (1971).

The first reason propounded by the majority for upholding the present scheme is, in its words, the

humane and rehabilitative one of ameliorating the rigor of life imprisonment for those offenders who are willing to acknowledge their crime.

[*Ante* at 402]

Such an exercise in circular logic tells us nothing. If the sole reason for offering a reduced sentence is that it serves humanitarian and rehabilitative functions, there is no reason why these same goals would not apply with equal force to defendants who choose, as they are constitutionally entitled, to have their guilt determined by a judge and jury. As eloquently stated by Judge Bazelon in *Scott, supra*:

Repentance has a role in penology. But the premise of our criminal jurisprudence has always been that the time for repentance comes after trial. The adversary process is a fact-finding engine, not a drama of contrition in which a prejudged defendant is expected to knit up his lacerated bonds to society.

There is a tension between the right of the accused to assert his innocence and the interest of society in his repentance. But we could consider resolving this conflict in favor of the latter interest only if the trial offered an unparalleled opportunity to test the repentance of the accused. It does not. There is other, and better, evidence of such repentance. The sort of information collected in presentence reports provides a far more finely brushed portrait of the man than do a few hours or days at trial. And the offender while

---

In striking down a disparate sentencing scheme based solely upon sex, the Court noted that it was concerned in that case with "confinement in a penal institution — a restraint on one's liberty, one of the most basic human rights." *Id.*

on probation or in prison after trial can demonstrate his insight into his problems far better than at trial.

If the defendant were unaware that a proper display of remorse might affect his sentence, his willingness to admit the crime might offer the sentencing judge some guidance. But with the inducement of a lighter sentence dangled before him, the sincerity of any cries of *mea culpa* becomes questionable. Moreover, the refusal of a defendant to plead guilty is not necessarily indicative of a lack of repentance. A man may regret his crime but wish desperately to avoid the stigma of a criminal conviction.

> [135 *U. S. App. D. C.* at 383, 384, 419 *F.* 2d at 270–1; footnote omitted]

The second reason offered by the majority for upholding the scheme is its asserted promotion of "flexibility and efficiency as well as justice in criminal justice administration." The third reason is simply a restatement of this: the conservation of "scarce judicial and prosecutorial resources for those cases which properly require trial." Taken together, these statements may be read to mean that our basic constitutional rights are not worth the time that we spend on them, and that a case is not really worth trying unless a defendant is willing to test his innocence against the possibility of a stiffer sentence if he is found guilty. Using the risk of life imprisonment as an incentive to ensure a vigorous trial contest seems unduly harsh at best and rather atavistic at worst. I can only conclude that the goals cited in support of the sentencing scheme fail to provide a legitimate state objective. They merely provide a pretext for further eroding our constitutional guarantees, an end which I regard as wholly illegitimate.

The final justification which the majority offers in support of the scheme is that it results in "prompter imposition of punishment on acknowledged offenders." Yet the folly in this bit of logic is that by upholding the scheme, we risk coercing a person into becoming an "acknowledged offender." While I am certainly in favor of reducing delays in our criminal justice system, I do not believe that we have a legitimate interest in discouraging persons from going to trial in order to be able to impose punishment more quickly.

## III

In spite of our long held beliefs that the constitutional guarantees associated with the right to a trial were available to *all* persons, we are now told that only those who are confident of victory should dare assert that right by going to trial. The possibility of a mandatory life sentence, with no hope for relief on appeal, will surely sober any defendant who naively believes, as a result of a fair reading of the Bill of Rights, that he was free to exercise unfettered discretion in determining whether to demand that the. State prove his guilt before a judge and jury.

This unfortunate result conflicts with an unbroken line of cases by the United States Supreme Court striking down governmental attempts to induce a person to waive his rights. In one stroke of the judicial pen the majority emasculates that Court's decisions in *Jackson* and *Griffin,* and undermines the firm foundation upon which those holdings rested. Thus I regard today's decision as a significant break with precedents of the Supreme Court setting forth minimum standards for protecting the important constitutional guarantees involved in this decision.

Finally, I note that the constitutional safeguards involved in this case — the right to a jury of one's peers, to confront one's accusers, to present witnesses in one's defense, to remain silent, and to have the State prove one's guilt beyond a reasonable doubt — are the virtual touchstones of the American criminal trial. By discouraging defendants from availing themselves of the protections which our Constitution offers, we undermine the basic values which form the core of our democratic system.

I respectfuly dissent. The life sentence imposed on the defendant should be vacated. I would remand to the trial court for resentencing in accordance with this opinion.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, CLIFFORD and SCHREIBER and Judge CONFORD—5.

*For remandment*—Justices SULLIVAN and PASHMAN—2.